653 F.2d 1100
 Callie Mae NEWSOM on behalf of herself and on behalf of all
others similarly situated, Plaintiff-Appellee,
Cross Appellant,
v.
VANDERBILT UNIVERSITY, Defendant-Appellant, Cross Appellee,
and
United States of America, Defendant-Appellant, Cross Appellee.
 Nos. 79-1026 to 79-1028.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 4, 1981.
Decided June 2, 1981.
Rehearing and Rehearing En Banc Denied July 17, 1981.
 
 William N. Ozier, Bass, Berry & Sims, Hal D. Hardin, U. S. Atty., Margaret M. Huff, Nashville, Tenn., for Vanderbilt University.
 G. Gordon Bonnyman, Jr., Robert L. Ray, Legal Services of Nashville and Middle Tennessee, Inc., John L. Carroll, Morris Dees, Jr., Southern Poverty Law Center, Montgomery, Ala., for Newsom.
 Carol C. Conrad, John Daniel Kiser, Florence E. Abrams, Public Health Division, Dept. of Health, Ed. and Welfare, Rockville, Md., for federal defendants.
 Kenneth R. Wing, Counsel for the American Public Health Ass'n, Chapel Hill, N. C., for amicus curiae American Public Health Ass'n.
 James Blumstein, Vanderbilt Law School, Nashville, Tenn., for amicus curiae Tennessee Hospital Ass'n.
 Before WEICK and KENNEDY, Circuit Judges, and BERTELSMAN, District Judge.*
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 All parties appeal from the judgment of the District Court construing the obligation of a hospital which had received monies for construction or modernization under the Hill-Burton Act, 42 U.S.C. §§ 291 et seq., to provide free or below-cost services for those unable to pay and the procedures the hospital must follow in carrying out that obligation.
 
 
 2
 Plaintiff Newsom filed this class action on behalf of all persons in Tennessee who have been, are now, or will be in need of health services for which they are unable to pay. She sued Vanderbilt University Hospital (Vanderbilt), claiming the hospital had never complied with its Hill-Burton obligation, and the Tennessee Department of Public Health and the Department of Health, Education and Welfare (HEW), claiming the state and federal agencies had not fulfilled their duty under the statute to promulgate regulations and to enforce the Hill-Burton obligation. She further alleged that the practices followed by the hospital and permitted by agencies violated due process under the Fifth and Fourteenth Amendments.
 
 
 3
 Plaintiff Newsom had been hospitalized at Vanderbilt for 23 days in 1971. Medicaid paid for part of the time, but did not pay for the remaining time. The hospital billed plaintiff for the unpaid balance and eventually started a collection suit against her in state court. When plaintiff initiated this class action suit, she requested an injunction of the state court proceeding. She also prayed for an injunction requiring the hospital to provide free services and mandamus requiring the agencies to promulgate regulations and enforce the Hill-Burton Act.
 
 
 4
 The District Court granted a temporary injunction against prosecuting the state collection suit and certified the class. After this action was filed, plaintiff Newsom filed a complaint with HEW, charging that Vanderbilt was failing to comply with its obligation under Hill-Burton to provide a reasonable volume of services to persons unable to pay therefor, which was dismissed. In a published opinion, 453 F.Supp. 401 (M.D.Tenn.1978), the court determined plaintiff's claim on the merits. It held that plaintiff was entitled to a de novo review in the federal court of the claim filed with HEW. It found no proof of noncompliance before 1973. For the period after 1973, the District Judge found that the regulations limited the hospital's obligation to twenty years from the date of completion of construction, which he held to be the date the funds were finally approved. He found the hospital had not complied with the regulations after 1973. He further found that plaintiff and the class had been denied due process as there was state action involved in Vanderbilt's providing free services and the class had a right to free services, but the class had no notice or opportunity to be heard. Therefore, the court held that new regulations were needed, but did not issue a writ of mandamus as the Secretary of HEW indicated that new regulations were being written. Since then, new regulations have been promulgated which differ in significant respects from what the District Court's opinion indicated due process required.
 
 
 5
 Each party appeals some portion of the District Court's decision. Plaintiffs and amicus curiae American Public Health Association attack the District Court's failure either to require the hospital to prove compliance before 1973 or to apply the twenty-year provision for twenty years following 1973. The hospital, HEW, and amicus curiae Tennessee Hospital Association appeal the findings that the hospital did not comply after 1973 and that plaintiffs' due process rights have been denied. They argue that the District Court was required to accept the decision of HEW unless it was not supported by substantial evidence. They object to the court's interpretation of the regulations. They further argue that there is no state action present, there is no entitlement to free services, and no right to as much process as the court insisted upon. Even if plaintiffs have some due process rights, they argue, the new regulations give plaintiffs all the process that is due.
 
 
 6
 The Tennessee Hospital Association claims the District Court had no jurisdiction. HEW raises a claim to sovereign immunity.
 
 I. STATUTES AND REGULATIONS OVERVIEW
 
 7
 The Hill-Burton Act was enacted in 1946. The stated purpose of the Act was to assist the several states to survey the need for construction of hospitals and develop programs for the construction of public and nonprofit hospitals as will, with existing facilities, "afford the necessary physical facilities for furnishing adequate hospital, clinic, and similar services to all their people" and "to construct public and other nonprofit hospitals in accordance with such programs." Hospital Survey and Construction Act of 1946, Pub.L. No. 725, § 601, 60 Stat. 1040, 1041. The Surgeon General was required to promulgate regulations to insure that the state plan provide for adequate hospital facilities for the people residing in the state and for adequate hospital facilities for persons unable to pay. The Surgeon General was authorized, but not required, to require assurances from any hospital which sought Hill-Burton funds that it would be available to all persons in the territorial area and that a reasonable volume of hospital services would be provided to persons unable to pay, unless such requirement was not financially feasible. Pub.L. No. 725, § 622(f), 60 Stat. 1043 (codified at 42 U.S.C. § 291c(e)). The Surgeon General did promulgate a regulation requiring hospitals to make these two assurances, although the regulation did not elaborate beyond the statute as to what was required. See Note, Due Process for Hill-Burton Assisted Facilities, 32 Vand.L.Rev. 1469, 1472 (1979). The authority of the Surgeon General was later transferred to HEW. Id. at 1471.
 
 
 8
 Various amendments, none pertinent here, were made to the Act. The regulations remained unchanged with respect to the reasonable volume of free or below-cost care until 1972 when new regulations were issued in response to litigation. These regulations, which were applicable to Vanderbilt July 1, 1973, set up a twenty-year limitation on the Hill-Burton free care assurance and determined specific levels of care which would constitute reasonable compliance. At that point, the regulations allowed the hospital to claim as its Hill-Burton obligation any services provided for which there had not yet been a collection effort other than billing. These regulations were amended in 1975, again in response to litigation, so that the hospital must determine eligibility for Hill-Burton care before rendering the service. See id. at 1472-74.
 
 
 9
 The Hill-Burton Act was amended again in 1975 as part of a comprehensive statute that sought to combine several existing statutes. The statute now read that the Secretary of HEW shall promulgate regulations to require assisted facilities to comply with their free service assurances and to demonstrate that compliance. The entities were required to submit periodic reports to support their claims of compliance, which the Secretary may not waive. See National Health Planning and Resources Development Act of 1974, Pub.L. No. 93-641, § 1602(6), 88 Stat. 2225, 2259 (enacted January 4, 1975) (codified at 42 U.S.C. § 300o -1(6)). The Secretary was required to investigate periodically and ascertain whether entities were complying and if any entity failed to comply, the Secretary was required to take action to enforce compliance. "An appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary" and the Secretary either dismissed the complaint or a civil action was not brought within six months for compliance. See Pub.L. No. 93-641, § 1612(c), 88 Stat. 2264 (codified at 42 U.S.C. § 300p-2(c)).[1] The regulations were entirely rewritten in 1979.
 
 II. JURISDICTION
 
 10
 Amicus Tennessee Hospital Association (THA) challenges the jurisdiction of the District Court on several grounds, some of which were never raised by the parties. This Court seriously questions whether it should consider grounds raised by an amicus curiae which have not been raised by the parties, see Knetsch v. United States, 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960) (Court had no reason to pass upon argument advanced by amicus curiae, but not advanced by petitioners), but this Court need not decide this issue as the Court finds the jurisdictional challenges have no merit.
 
 
 11
 THA advances four arguments for its claim that the District Court lacked jurisdiction. First, that the suit was in violation of the anti-injunction act. Second, that there was no case or controversy. Third, that plaintiff Newsom failed to exhaust her administrative remedy. Fourth, that the federal court should have deferred to the state court as a matter of comity.
 
 
 12
 THA claims that by issuing a preliminary injunction against the state collection action, the District Court violated the anti-injunction statute and therefore had no jurisdiction. The anti-injunction statute, 28 U.S.C. § 2283, prohibits courts of the United States from enjoining proceedings in state courts with certain exceptions. Plaintiffs' complaint prayed for relief other than the injunction against the state court action. The temporary restraining order expired April 24, 1975, long before trial commenced September 8, 1977, without being renewed. It is not a part of the decision from which the appeal is taken. Thus, this point is moot.
 
 
 13
 THA claims there is no case or controversy as plaintiff Newsom's hospital care was in 1971, before the 1973 regulations were passed. THA argues that Newsom cannot complain that the 1973 regulations failed to provide due process or that the hospital failed to provide an adequate amount of uncompensated services as required by the 1973 regulations because these regulations did not affect her. However, this is a class action on behalf of all those who have been or will be seeking uncompensated services under the Hill-Burton Act. That Newsom's past bill may have been resolved does not remove the future need of Newsom and the other class members to uncompensated care beyond what Medicaid or other insurance plans will provide. Moreover, the record shows that plaintiff Newsom tried to take her son to the hospital in 1978 and the hospital refused to give her son free service when Medicaid refused to pay for the services. The Article III limitation of judicial power to cases and controversies is concerned with whether suits will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151-52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). THA has not shown plaintiffs failed to meet this requirement.
 
 
 14
 THA argues that since plaintiffs did not first file with the Secretary, they did not exhaust their administrative remedies and the District Court had no jurisdiction over their Hill-Burton Act claims. The exhaustion requirement was added to the Hill-Burton Act by the National Health Planning and Resources Development Act of 1974, see Pub.L. No. 93-641, § 1612(c), 88 Stat. 2264, which was approved January 4, 1975. Suit was filed in the present case April 14, 1975. Several courts have held that failure to file a complaint with the Secretary of HEW precludes an action in federal court to enforce the Hill-Burton free-care obligation. See Barlow v. Marion City Hospital District, 495 F.Supp. 682, 692-93 (M.D.Fla.1980); Lugo v. Simon, 453 F.Supp. 677, 684-85 (N.D.Ohio 1978); Gordon v. Forsyth County Hospital Authority, Inc., 409 F.Supp. 708, 722 (M.D.N.C.), modified, 544 F.2d 748 (4th Cir. 1976) (per curiam). Subsequent to filing the lawsuit, plaintiff Newsom filed an administrative complaint with HEW February 4, 1977. The Secretary determined, in a written decision dated August 4, 1977, that the hospital had substantially complied with its Hill-Burton obligation. Trial without jury was had September 8, 1977 and the District Court rendered its decision June 1, 1978. Prior to trial on the merits by the court below, then, plaintiff Newsom did exhaust her administrative remedies. Not every member of a class action must exhaust the administrative remedies one is sufficient. See Barlow, supra, 495 F.Supp. at 693. This Court holds, as did the court below, that the claim that plaintiffs have failed to exhaust their administrative remedies has been mooted. See Gordon, supra, 544 F.2d at 749 (plaintiffs' claims were denied for failure to exhaust; court of appeals remanded claims after plaintiffs exhausted administrative remedies while appeal was pending).
 
 
 15
 Comity is not an applicable doctrine here. Comity reflects a concern that state courts be permitted to try state cases without judicial interference. See Younger v. Harris, 401 U.S. 37, 43-44, 91 S.Ct. 746, 750-751, 27 L.Ed.2d 669 (1971). It applies where the federal court is faced with litigation which involves the same parties and the same issues as litigation pending or soon to be pending in the state court. See Trainor v. Hernandez, 431 U.S. 434, 440, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977). In the present case, by the time the trial was had and the decision was rendered, there was no state case pending which would have been affected by the District Court's decision. The only state case that had been pending was a state collection case which did not involve the agencies as defendants, nor the claims of failure to comply with the federal statute or the deprivation of due process.
 
 
 16
 THA has not shown that the District Court lacked jurisdiction in this case.
 
 III. SOVEREIGN IMMUNITY
 
 17
 HEW claims plaintiffs cannot sue it because of the doctrine of sovereign immunity. The Supreme Court held in Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), that a suit against an agency official would otherwise be barred by sovereign immunity unless the official's action was not within the officer's statutory powers or unless the exercise of those powers was constitutionally void. The Court left any change in the doctrine to Congress. Congress provided in the Administrative Procedure Act, 5 U.S.C. § 702, that a person suffering a legal wrong or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review. An action seeking relief other than money damages and stating a claim that the agency acted or failed to act in official capacity shall not be dismissed because it is against the United States. Since plaintiffs did not sue for monetary damages, but only for declaratory and injunctive relief and mandamus, the doctrine of sovereign immunity does not bar their claim. See Hill v. United States, 571 F.2d 1098, 1102 (9th Cir. 1978); Jaffee v. United States, 592 F.2d 712, 718-19 (3d Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979).
 
 
 18
 IV. INTERPRETATION OF THE STATUTE AND REGULATIONS
 
 A. De Novo Review
 
 19
 The hospital and HEW argue that the interpretation of a statute by the agency charged with administering that statute should be given deference. In the present case, the HEW had determined that the hospital was in substantial compliance. This decision, they feel, should be binding on the District Court unless it is not supported by substantial evidence.
 
 
 20
 The Hill-Burton Act provides that a civil action to enforce compliance with assurances to provide free services may be brought by the Attorney General or by a private party (after administrative relief has been exhausted). See 42 U.S.C. § 300s-6. This section does not describe what standard of review the District Court should utilize, unlike the section providing for judicial review of the agency's decision to refuse an application for Hill-Burton funds (which provided that the finding of the agency shall be conclusive if supported by substantial evidence). See 42 U.S.C. § 291h(b).
 
 
 21
 The Administrative Procedure Act authorizes a court reviewing agency action to set aside the agency action if it finds the action is unsupported by substantial evidence in certain cases or is unwarranted by the facts to the extent the facts are subject to trial de novo. See 5 U.S.C. § 706(2). The Supreme court has held that the substantial evidence test only applies where the agency action is taken pursuant to rulemaking provisions of the Administrative Procedure Act or where the agency action is based on a public adjudicatory hearing. The de novo review is only authorized where the action is adjudicatory in nature and the agency factfinding procedures are inadequate. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-15, 91 S.Ct. 814, 822-823, 28 L.Ed.2d 136 (1971). However, the Administrative Procedure Act does not prevent the court from engaging in de novo review where the language of the statute or the legislative history authorize a trial de novo. See Chandler v. Roudebush, 425 U.S. 840, 861-62, 96 S.Ct. 1959-1960, 48 L.Ed.2d 416 (1976). In Chandler, the Court noted that private sector people have a right to de novo review of their Title VII claims after the Equal Employment Opportunity Commission rejects their complaints, and held that federal employees have the same right to de novo review in District Court after their administrative complaints are found to be unsupported.
 
 
 22
 Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(1), provides that if a charge filed with the EEOC is dismissed or if a civil action is not brought within 180 days from the filing of the complaint, then the complainant may file a civil action in District Court. The Hill-Burton Act, as amended, provides that any person may sue to enforce the Hill-Burton obligation if a complaint has been filed with the Secretary of HEW and the Secretary dismissed the complaint or the government had not commenced a civil action within the six months of filing the complaint. See 42 U.S.C. § 300s-6. By analogy to Title VII, in light of Chandler, we hold that plaintiffs were correctly granted a trial de novo.
 
 
 23
 B. Twenty-Year Provision/Demonstration of Compliance Before 1973
 
 
 24
 The District Court held that the hospital's Hill-Burton free-care obligation extended for twenty years from the date of completion of the construction of the facility and that the hospital did not have to prove compliance prior to the effective date of the 1972 regulations (effective July 1973). Plaintiffs claim that either the twenty-year provision should start in 1973 when the hospital has to prove compliance or the hospital should have to prove compliance before 1973. Otherwise, they argue, the hospital will have received the Hill-Burton funds without providing twenty years of compliance as contemplated by the regulations the hospital would, in effect, get a free ride for the years prior to 1973 and thereby deprive plaintiffs of eleven years of free services to which they are entitled.
 
 
 25
 The regulation that existed before 1973 stated in relevant part:
 
 
 26
 The facility will furnish below cost or without charge a reasonable volume of services to persons unable to pay therefor. As used in this paragraph, "persons unable to pay therefor" includes persons who are unable to pay the full cost of needed services. Such services may be paid for wholly or partly out of public funds or contributions of individuals and private and charitable organizations such as community chest or may be contributed at the expense of the facility itself. In determining what constitutes a reasonable volume of services to persons unable to pay therefor, there shall be considered conditions in the area to be served by the applicant, including the amount of such services that may be available otherwise than through the applicant. The requirements of assurance from the applicant may be waived if the applicant demonstrates to the satisfaction of the State agency, subject to subsequent approval by the Secretary that to furnish such services is not feasible financially;
 
 
 27
 42 C.F.R. § 53.111(b) (Jan.1972). Thus, neither the regulation nor the statute required that the applicant demonstrate compliance.
 
 
 28
 The new regulations effective in 1973 provided that every facility which had to give reasonable assurance was required to fulfill that obligation for only twenty years from the date of the completion of the construction. See 42 C.F.R. § 53.111(a) (1977). Presumptive compliance would be met if the facility provided uncompensated services per year equal to 3% of operating costs or 10% of all federal assistance under the Act, whichever was lesser, or by having an open-door policy and not excluding anyone on the ground of inability to pay. See 42 C.F.R. § 53.111(d) (1977). Each applicant was required to submit annual compliance reports. See 42 C.F.R. § 53.111(e) (1977). The states were required to establish criteria for identifying persons unable to pay. See 42 C.F.R. § 53.111(g) (1977). These sections remained unchanged when the regulations were amended in 1975. See Note, supra, 32 Vand.L.Rev. at 1500-1503.
 
 
 29
 Although noting that the hospital would not have met the 1973 standards had they been applicable in the years prior to 1973, the District Court ruled that applying the 1973 standards retroactively would be unfair. The hospitals would be at a disadvantage as the prior regulations did not require the hospitals to keep separate records for Hill-Burton accounts and the hospitals which had complied may be unable to prove compliance before 1973. The court did not apply the twenty-year provision starting for 1973 as that would be unfair to hospitals which had complied with the regulations before and did provide a reasonable volume of services to those unable to pay. The prior regulations did not require the hospital to prove compliance. As "reasonable volume" was undefined, and almost undefinable, the court held that plaintiffs failed to prove Vanderbilt failed to comply before 1973 and refused to order it to comply or prove compliance for the years prior to 1973. See 453 F.Supp. at 410-412.
 
 
 30
 Plaintiffs do not object to the court's determination that the date of final authorization of the funds was the equivalent to the date of completion of construction under the regulations. Nor do plaintiffs challenge the court's finding that the twenty-year limitation is a reasonable exercise of the Secretary's discretion under the Act, as several other courts have held. See Cook v. Ochsner Foundation Hospital, 559 F.2d 968, 974 (5th Cir. 1977); Lugo v. Simon, 426 F.Supp. 28, 33-35 (N.D.Ohio 1976); Corum v. Beth Israel Medical Center, 373 F.Supp. 550, 556-57 (S.D.N.Y.1974). Plaintiffs do not even object to the court's decision not to apply the 1973 regulations retroactively. They argue, however, that the court applied the presumptive compliance section prospectively but the twenty-year provision retroactively and thereby deprived plaintiffs of the free care to which they were entitled. Even though "reasonable volume" is difficult to define under the prior regulations, they insist the court should not have held it was undefinable and freed the hospital of its obligation.
 
 
 31
 The District Court correctly applied the regulations. Applying the twenty-year provision as it did was not a retroactive application of the regulation. The regulation itself provided that the twenty-year provision started when the construction was completed. Any prospective application of the limitation would have to start counting from the date the construction was completed. By the regulation, the Secretary clearly contemplated that for some facilities the date of completion would have been prior to the date of the new regulations and intended the result the District Court reached as the twenty-year limitation expressly applied to "every applicant which heretofore has given or hereafter will give an assurance," but only for twenty years after the completion of construction. See 42 C.F.R. § 53.111(a) (1977).
 
 
 32
 The District Court also correctly ruled that the hospital did not have to prove compliance before 1973. Plaintiffs are seeking to shift the burden of proof. Whether definable or not, neither the statute nor the regulations prior to 1973 required the hospital to prove it complied. The District Court found as a matter of fact that noncompliance before 1973 had not been proved. The court noted the evidence showed that Vanderbilt turned away any patient who was not an emergency patient and who had no way of paying for the services. Some were sent away with no place to go. Others were sent to other facilities. The court also noted that Vanderbilt did accept patients whose bills were paid for by Medicaid and Medicare. The then-existing regulation, quoted above, stated that the services to persons unable to pay may be paid for by public funds, contributions of individuals and organizations, or the expense of the facility itself. Plaintiffs appear to insist that the hospital was required to have paid for those unable to pay out of its own funds contrary to the language of the regulation. The District Court's finding that plaintiffs had failed to prove noncompliance is not clearly erroneous, see Rule 52, Fed.R.Civ.Pro., and this Court must affirm on this issue.
 
 C. Post-1973 Compliance
 1. Reports
 
 33
 The regulations effective in 1973 provided that the hospital must furnish compliance reports. See 42 C.F.R. § 53.111(e) (1977). The level of uncompensated services was measured by the difference between the amount charged and the reasonable cost. See 42 C.F.R. § 53.111(b)(6) (1977). Any amount received from a third party insurer or a government program or the reasonable cost of any service which would be available under a government program was to be excluded from the computation. See 42 C.F.R. § 53.111(f)(2) (1977). "Reasonable cost" was defined as the cost of providing the services as determined under the Social Security Act. See 42 C.F.R. § 53.111(b)(5) (1977). See generally, Note, supra, 32 Vand.L.Rev. at 1505.[2]
 
 
 34
 Between 1964 and 1974, Vanderbilt received about $3,181,009.63 in Hill-Burton funds. Under the presumptive regulations effective in fiscal year 1973, Vanderbilt owed $318,000 per year in uncompensated services to those unable to pay. The state agency approved the hospital's reports which indicated the charges for services rendered and set the level of the charges at $400,000 per year for the hospital's Hill-Burton obligation.
 
 
 35
 The District Court held this procedure violated the regulations. Reports were required to be filed on a reasonable cost basis, not a charge basis. The court noted that all parties seemed to agree that the charge could be converted to cost by using a factor of 75%. See 453 F.Supp. at 418. However, the court was concerned that a charge basis resulted in real inflation of the value of the Hill-Burton obligation even after being reduced by 25%. Based upon Vanderbilt's answer to a request for admission, it found that the hospital included in its Hill-Burton obligation the difference between its charge to Medicare or Medicaid patients and the cost paid by Medicaid or Medicare. But, if the hospital accepted Medicaid or Medicare payment for a service, that was supposed to be payment in full. The difference between that payment and the charge was not properly chargeable to its Hill-Burton obligation, but merely a cost of accepting Medicaid or Medicare. Charge reporting rather than cost reporting hides this overage. The hospital claims that this problem of inflation is no longer a problem due to changed procedures. They also argue that as charges are determined case by case and costs are determined by looking at the aggregate of costs for all patients over a period of time, they cannot maintain their records on a cost basis and thus cannot comply with the court's decision.
 
 
 36
 On the record before it, the finding of the court below was not clearly erroneous. Vanderbilt's response to number 27 in plaintiff's second request for admissions, upon which the District Court relied, is ambiguous. The request for admission stated:
 
 
 37
 Vanderbilt University Hospital takes credit for services rendered in satisfaction of its Hill-Burton uncompensated care obligation by subtracting from the full charge for all services rendered any dollar amounts received from Medicare, Medicaid, or any other third-party source. The entirety of this balance is charged to the Hill-Burton Program in satisfaction of the Hospital's "uncompensated services" obligation.
 
 Vanderbilt answered:
 
 38
 Admitted. Only the dollar value of services not covered by Medicare, Medicaid, or other third parties, is charged to the uncompensated service obligation, provided that the portion of the patient's account qualifies for such determination.
 
 
 39
 Although this statement may not be enough to support the District Court's conclusion because of its ambiguity, other evidence supports the District Court's conclusion that the reports should be maintained on a cost basis. The language of the regulation states that the level of uncompensated services is to be determined by the difference between the charge and the reasonable cost. See 42 C.F.R. § 53.111(b)(6) (1977). The standard is thus measured in terms of reasonable cost. The record shows that defendants Gunter and Fowinkle from the Tennessee agency in response to requests for admissions admitted they approved the compliance reports of Vanderbilt for fiscal years 1973 through 1976, but that the materials submitted by the hospital did not provide adequate information to enable the agency to monitor compliance of the "uncompensated services" assurances given by the hospital. See App. at 247.
 
 
 40
 Moreover, the District Court's decision is consistent with an interpretation by HEW. In a Policy Memorandum dated May 9, 1973, HEW stated that when reimbursement to the hospital was below cost, then the measurement of uncompensated care was the difference between the amount received from or on behalf of a patient and the reasonable cost. See App. at 248. By implication, the hospital should not include the difference between the reasonable cost and the charge as part of the Hill-Burton obligation where the charge is greater than the reasonable cost. As this administrative interpretation is reasonable and consistent with the statute, it should be respected. See Udall v. Tallman, 380 U.S. 1, 4, 16, 85 S.Ct. 792, 795-801, 13 L.Ed.2d 616 (1965).
 
 
 41
 Records based on charges alone, even if the total amount is substantially greater than the obligation, as in the present case, do not establish whether those charges were above or below the reasonable cost, as defined by the regulations. Thus, records based on charges do not indicate the level of compliance and the District Court correctly ruled that the reports accepted based on charge reporting did not comport with the regulations.
 
 
 42
 The District Court enjoined the hospital from reporting Hill-Burton uncompensated care on any basis other than that prescribed in the Act or current regulations promulgated under the Act. The state and federal defendants were enjoined from finding the hospital in compliance on the basis of reports and/or hospital records that do not clearly evidence compliance under the Act and current regulations. See 453 F.Supp. at 430. The District Court did not, as the hospital laments, require the hospital to keep its internal records on a reasonable cost basis. The court below only held that if the hospital's reports are not on a reasonable cost basis as it determined the regulations required, then the state and federal agencies cannot rely on the hospital's records if those too are on a charge basis and fail to disclose reasonable cost. The hospital is free to keep its records on a charge basis. But when it computes the aggregate Hill-Burton services provided for the year, it must use the reasonable cost and report reasonable cost figures.
 
 
 43
 The hospital questions the applicability of this portion of the District Court's order since new regulations have been promulgated since its decision. Since the court ordered the parties to comply with current regulations, the language of the injunction is unaffected by the 1979 regulations, which are effective whenever the facility's fiscal year 1979 begins, but no later than September 1, 1979. See 44 Fed.Reg. 29372 (May 18, 1979).
 
 
 44
 The new regulations impose slightly different reporting requirements, in part to take care of concerns raised here. The regulations now exclude explicitly from "uncompensated services" any amount received from a third party insurer or any amount in excess of any amount received from the third party insurer if the facility has agreed to accept that amount as payment in full. See 42 C.F.R. § 124.509 (1979), reprinted in 44 Fed.Reg. 29378 (May 18, 1979). "Uncompensated services" now means services made without charge or at a charge which is less than the allowable credit. It equals the total allowable credit for those services less the amount charged for services following an eligibility determination. "Allowable credit" means the lesser of the facility's usual charge for services or the usual charge multiplied by the percentage which the total allowable cost in the preceding years bears to the facility's total patient revenue. See 42 C.F.R. § 124.502, reprinted in 44 Fed.Reg. 29375-76 (May 18, 1979). Thus, under the new regulations, for the fiscal year 1979 and following, the hospital must submit reports based upon the amount of its total costs for the previous year, its total revenues, and its usual charges. For the years following 1979, the state and federal agencies may accept reports which comply with the new regulations, even though the reports do not state the "reasonable cost" as it was defined by the previous regulations. Vanderbilt urges that the new regulations do no more than provide a method of calculating reasonable cost and it should be allowed to use this method in submitting amended reports for the years between 1973 and 1979. This question does not appear to have been submitted to the District Court. The action will be remanded to the District Court for consideration of this issue in light of the new regulations.
 
 2. Qualifying Services
 
 45
 The regulations effective in 1973 provided that only services provided to an individual whose eligibility was determined prior to any collection effort, other than the rendition of bills, shall be included in uncompensated services for purposes of the Hill-Burton obligation. See 42 C.F.R. § 53.111(f)(1) (1975); Note, supra, 32 Vand.L.Rev. at 1504. In response to litigation, see Corum v. Beth Israel Medical Center, 373 F.Supp. 550, 557-58 (S.D.N.Y.1974), this regulation was changed in 1975 to provide that the determination of eligibility shall be made prior to the provision of services, except where emergency services were required, where a change had occurred in financial conditions, or where incomplete or erroneous information was received. See 42 C.F.R. § 53.111(f)(1) (1977); Note, supra, 32 Vand.L.Rev. at 1504. The District Court held that the hospital had knowledge as of September 5, 1974 of an interim regulation which was the same as the final regulation, which was effective October 6, 1975, and could not after September 5, 1974 include in its Hill-Burton obligation any services for which the patients were billed in violation of this regulation. See 453 F.Supp. at 413-15. This finding was not appealed.
 
 
 46
 The 1975 regulation provided two exceptions from the requirement that eligibility be determined before services were rendered:
 
 
 47
 (i) Such determination may be made after the provision of such services in the case of services provided on an emergency basis: Provided, That when billing is made for such service, such billing must be accompanied by (notice of the Hill-Burton Act and Vanderbilt's obligations thereunder); and
 
 
 48
 (ii) Such determination may be made after the provision of such services in the case of a change in circumstances as a result of the illness or injury occasioning such services (e. g., the patient's financial condition has changed due to a loss of wages resulting from the illness) or in case of insurance coverage or other resources being less than anticipated or the costs of services being greater than anticipated. Further, in all cases where such determination was not made prior to the provision of services, such services may not be included as uncompensated services if any collection effort has been made other than the rendering of bills permissible in the above exceptions: ...
 
 
 49
 42 C.F.R. § 53.111(f)(1) (1977) (emphasis in original).
 
 
 50
 The District Court read the clause "Further, in all cases ... rendering of bills permissible" as requiring notice of the HillBurton Act with any billing for services that the facility later wanted to count as part of its Hill-Burton obligation. The hospital argues that notice is required with emergency patients as they never had a chance to read the posted notice in the hospital,[3] but not with the patients who had had changed financial circumstances. The latter class of patients would have had an opportunity to read the posted notices and did not need a further notice.
 
 
 51
 The District Court has misread this regulation. The notice provision only occurs in (i), which is limited to emergency patients. The "in all cases" language of (ii) does nothing more than require that whenever there is a billing, there must not be any further collection activities. "Rendering of bills permissible in the above exceptions" is plural nothing indicates that the exceptions must be treated identically. That emergency patients must be given notice with the billing in order to be counted as Hill-Burton services does not mean that patients with changed circumstances must be so notified. For the time period that this regulation was applicable, 1975 through 1978, the District Court's opinion is modified to provide that the lack of notice with the billing to patients who have had changed financial circumstances does not prevent these services from being counted toward the Hill-Burton obligation. This modification is limited to that time period since the 1979 regulations require that every person shall receive individual notice before services are rendered. With an emergency patient, the hospital now must provide notice to next of kin or to the patient as soon as practical, but not later than with the first billing. See 42 C.F.R. § 124.505(d), reprinted in 44 Fed.Reg. 29377 (May 18, 1979). Thus, notice of the Hill-Burton Act must accompany any services rendered after the beginning of fiscal year 1979 that the hospital wants to include as Hill-Burton services for which the hospital has billed the patient.
 
 V. DUE PROCESS RIGHTS OF PLAINTIFFS
 A. State Action
 
 52
 Plaintiffs alleged that the hospital deprived them of due process by not providing adequate procedures to protect their right to free service. They claimed the state and federal agencies, by not promulgating regulations, deprived them of due process.
 
 
 53
 The Fifth and Fourteenth Amendments apply to actions of the federal and state governments respectively. To the extent the federal or state agency deprived plaintiffs of rights protected by due process by failing to enact regulations or to enforce regulations, their actions are clearly government actions as no private party would be involved in the promulgation of regulations or the enforcement thereof.
 
 
 54
 Due process, however, does not protect against purely private actions. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 721, 81 S.Ct. 856, 859, 6 L.Ed.2d 45 (1961). The determination whether or not a private entity's actions can be considered state action is necessarily a case-by-case determination. Id. at 722, 81 S.Ct. at 860.
 
 
 55
 The District Court found the actions of the hospital in failing to provide the requisite uncompensated services under the Hill-Burton Act were sufficiently involved with actions of the state and federal governments that the due process guarantees of the Fifth and Fourteenth Amendments applied to the actions of the hospital. It found state action because the hospital's action which was the subject of the complaint the failure to provide obligated free services was related to the state and federal activity providing the funds in exchange for which the free services were to be provided. It further held that furnishing hospital services for the poor was considered to be a state duty by Tennessee and therefore the hospital was performing a state function. See 453 F.Supp. at 419-22.
 
 
 56
 In Burton, supra, the Supreme Court found state action through the symbiotic relationship between the state agency and the private entity. The private entity was a privately owned restaurant that leased space from a publicly owned parking building, which had been built with public funds, enjoyed tax exemptions, and on which were flown the state and national flags. Customers of the restaurant parked in the public structure, parking customers used the restaurant. The restaurant was open to the public. The Court found that physically and financially the restaurant was an integral part of a public building and that the state was a joint participant in its operation. Therefore, the Court held that when the restaurant refused to serve someone on account of race, that was state action.
 
 
 57
 The Supreme Court did not find state action in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The inquiry, said the Court, must be whether or not there is a sufficiently close nexus between the state and the challenged activity of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. See 419 U.S. at 351, 95 S.Ct. at 453. The Court refused to hold that the actions of a privately owned utility constituted state action despite its being heavily regulated by the state or that it might have had a monopoly granted by the state. The Court also refused to find that the actions of the utility were state actions even though the utility was performing an essential public service. There may be state action where a private entity exercises power traditionally reserved to the states, but in Jackson, the state imposed the duty to provide service to all upon the private company, not upon itself.
 
 
 58
 The public function doctrine was explained further in Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The public function exception only applies to those functions which were exclusively reserved to the states traditionally. Many functions have been traditionally performed by governments, but few have been exclusively reserved to the states, such as conducting elections and providing all the municipal services of a town.
 
 
 59
 In the present case, the record does not show that Tennessee ever exclusively reserved to itself the function of providing free hospital services to those unable to pay. Nor has the federal government ever exclusively reserved to itself this function. Indeed, the regulations existing before 1973 noted that funds for the free services could come from private contributions. Thus, the District Court erred in finding state action based upon the public function exception.
 
 
 60
 There remains the question whether or not there is a sufficiently close nexus between the state action and the activities of the hospital in providing the services or whether a symbiotic relationship existed.
 
 
 61
 The Supreme Court has not considered whether the receipt of Hill-Burton funds renders the hospital's actions state action. In Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Supreme Court considered whether or not an Arizona statute requiring a year's residence in the county as a condition to receiving non-emergency hospitalization or medical care at county expense was constitutional. Justice Douglas, in a separate opinion, would have found the statute unconstitutional in part because the county received funds under the Hill-Burton Act. See 415 U.S. at 271-73, 94 S.Ct. at 1088-1090. The majority, however, did not rely on the Hill-Burton Act. The majority found that as the Arizona statute charged the county governments with the mandatory duty of providing necessary hospital and medical care for indigent sick people, the residency requirement denied a basic necessity of life and thus was an unconstitutional penalty on the right to travel. See 415 U.S. at 269, 94 S.Ct. at 1087. Since the present case deals with a private entity furnishing free care, not with a public entity with an obligation to furnish hospital care to every indigent person, Memorial Hospital does not apply here.
 
 
 62
 The Supreme Court considered an analogous situation in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). There, the plaintiff, a Negro, sued the Lodge, a private entity, for refusing to serve him food and drink on account of his race. The Lodge had a liquor license granted by the state liquor control board; because of this license, the Lodge was subject to regulation. The Court held that there was no symbiotic relationship here between the state and the private entity the private entity was not open to the public, it was on private property and was funded by private funds. That it received a benefit from the state in the form of a liquor license and was subject to regulation was not enough to make the action complained of refusing to serve plaintiff state action. The state statute did not covertly or overtly encourage discrimination. The Court refused to find state action even though the liquor licenses given to private clubs were counted towards the maximum allocated by the population and even though, as Justice Douglas pointed out in dissent, see 407 U.S. at 182, 92 S.Ct. at 1976, at certain times liquor was available only at the private clubs.
 
 
 63
 Several lower court cases have considered whether the receipt of Hill-Burton funds made certain actions of the hospital state action. Several found no state action where the hospital activity was unrelated to the free-service obligation and was not regulated by the state or federal government, such as decisions to deny doctors staff privileges, see Ascherman v. Presbyterian Hospital of Pacific Medical Center, Inc., 507 F.2d 1103 (9th Cir. 1974); Ward v. St. Anthony Hospital, 476 F.2d 671 (10th Cir. 1973), to refuse to sterilize patients, see Chrisman v. Sisters of St. Joseph of Peace, 506 F.2d 308 (9th Cir. 1974); Holton v. Crozer-Chester Medical Center, 419 F.Supp. 334 (E.D.Pa.1976), vacated and remanded, 560 F.2d 575 (3d Cir. 1977) (remanded to consider motion to amend complaint to establish jurisdiction on other grounds), or to refuse to perform abortions, see Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973).
 
 
 64
 The Fourth Circuit found state action where a hospital, which had received Hill-Burton funds, refused to give staff privileges or treat certain patients on account of their race. At that time, the statute and regulations provided that a hospital did not have to be available to all if separate facilities were available. See Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963) (en banc), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). In a later case involving a similar allegation, the court found state action not through the statutory authorization for discrimination but through several facts: the hospital had a deed from the city and county with a reverter clause, it had tax-exempt status, it exercised the power of eminent domain, and it received subsidies for capital construction from the state and federal governments. See Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964). More recently, the Fourth Circuit has decided that the receipt of Hill-Burton funds is sufficient to make even the decision to deny a doctor staff privileges state action. See Christhilf v. Annapolis Emergency Hospital Ass'n, Inc., 496 F.2d 174 (1974).
 
 
 65
 This Circuit has rejected the conclusion reached in Christhilf. It has found state action in cases involving denial of staff privileges where the hospitals were in part governed by, or the governing body was appointed by, public officials. See O'Neill v. Grayson County War Memorial Hospital, 472 F.2d 1140 (6th Cir. 1973); Chiaffitelli v. Dettmer Hospital, Inc., 437 F.2d 429 (6th Cir. 1971) (per curiam); Meredith v. Allen County War Memorial Hospital Comm'n, 397 F.2d 33 (6th Cir. 1968). However, that the hospital was regulated by state and federal governments and had received funds under the Hill-Burton Act was not enough for a private hospital's decision to deny a doctor staff privileges to be state action. Something more than partial federal funding is needed for state action. See Jackson v. Norton-Children's Hospitals, Inc., 487 F.2d 502, 503 (6th Cir. 1973) (per curiam), cert. denied, 416 U.S. 1000, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974).
 
 
 66
 This Court rejected an analogous claim of state action in Griffith v. Bell-Whitley Community Action Agency, 614 F.2d 1102, 1108-10 (6th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122 (1980). The plaintiffs in that case challenged their discharges from the community action agency as violations of their First and Fifth Amendment rights. They claimed the actions of the agency were government actions because the agency received virtually all of its operating funds from the federal government, was subject to extensive regulations, and was part of the federal government's war on poverty. This Court held the private agency did not have a symbiotic relationship with the government so as to fall under Burton ; nor was there a nexus between the funding and the regulations and the action challenged. Thus, the complaints were dismissed for failure to state a cause of action.
 
 
 67
 Griffith and Jackson preclude finding a symbiotic relationship here because of the government funding or regulations. Without more, these cases would also preclude finding a sufficient nexus between the state activity and the challenged activity.
 
 
 68
 The District Court found "something more" in the present case in that in this case, unlike the other cases decided in this Circuit, the hospital's objectionable action was related to the activity required in exchange for funding by the government. The federal government gave grants for construction. Pursuant to the regulations, as a condition of that grant, the recipient was required to give a reasonable volume of services to those who could not pay. Thus, the challenged private activity in the present case is directly related to the state action: the government intended to create a mechanism for distributing some free services and the hospital was the private entity providing that service.
 
 
 69
 Moose Lodge, however, creates a problem for this analysis. In Moose Lodge, the state action was the granting of a liquor license. By granting the license, the state contemplated that liquor would be sold to patrons. The plaintiff there complained that he was not being served liquor. Thus, as in the present case, the challenged action of the private entity in Moose Lodge was directly related to the state activity. Perhaps Moose Lodge is distinguishable because in Moose Lodge although the state intended to regulate the sale of alcoholic beverages, the state did not have any state purpose in selling liquor to citizens, whereas in the present case, the government does have a governmental purpose in providing through some mechanism hospital care for the indigent. However, in Moose Lodge, the state could very well have wanted to sell alcoholic beverages in order to collect the taxes.
 
 
 70
 The present case is a closer case than others previously decided in this Circuit. However, this Court need not decide whether or not there is state action as assuming arguendo there is state action, this Court holds no individual plaintiff has a right to free services protected by the Fifth and Fourteenth Amendments.
 
 B. Entitlement to Free Services
 
 71
 Even where a private entity's action constitutes state action, it will not deprive anyone of due process unless that action affects some liberty interest or property interest protected by due process. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).
 
 
 72
 The Supreme Court has in a number of cases discussed what equals a protectable interest. In Roth, the Court held the protected property interest must be found in some law outside of the constitutional due process guarantees which creates more than a unilateral expectation of a benefit. The external law must create a legitimate claim of entitlement. See 408 U.S. at 577, 92 S.Ct. at 2709. The plaintiff in Roth did not have such an entitlement in his claim for a hearing before his teaching contract was not reviewed. He was hired for one year with no provision in the contract or the enabling legislation for renewal. The Court also failed to find a property right to continued employment as a city policeman where the ordinance describing the job had been interpreted to be employment-at-will. See Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Court held that prisoners under the state law in question did not have a protected interest in not being transferred from one prison to another, less favorable prison. The state law had allowed transfer in a wide variety of circumstances with discretion vested in the prison officials. The Court again considered the due process rights of prisoners in Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The Court rejected the notion that the mere possibility of parole release created by state statute was enough to trigger due process. See 442 U.S. at 8-11, 99 S.Ct. at 2104-2105. However, under the statute in question, the Court did find that a legitimate claim of entitlement to some due process had been created. The statute in question provided that when the parole board considered a prisoner eligible for parole, the board shall release the prisoner unless one of four findings which were partly subjective and partly factual were made. See 442 U.S. at 11-12, 99 S.Ct. at 2105-2106.
 
 
 73
 The District Court in the present case found that the statute and the regulations gave the plaintiffs a right to free services and, therefore, they were entitled to reasonable notice and an opportunity to be heard, which the court found lacking. See 453 F.Supp. at 422-23. However, this Court does not agree.
 
 
 74
 The statute prior to 1975 did not provide any right to free services. The statute required that, through promulgated regulations, the state plans were required to provide for adequate hospitals for all persons residing in the state and adequate hospitals to furnish needed services for persons unable to pay. However, the statute did not mandate that the hospitals receiving funds give assurances that they would provide a reasonable volume of services to those unable to pay the language of the statute was permissive. "Such regulations may also require that before approval ... there will be available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor...." See 42 U.S.C. § 291c(e)(2) (emphasis added). A close reading of the legislative history indicates that while there was some concern about providing health care for the poor, having hospitals carry the burden by providing free services is not the answer. The Hill-Burton Act was only a first step to help construct the necessary facilities. Certainly, the Hill-Burton Act by itself was not intended to provide the needed services for all who could not pay.[4] See Cook v. Ochsner Foundation Hospital, 559 F.2d 968, 971-72 (5th Cir. 1977) (individual applicant for Hill-Burton funds would not be expected to supply the total quantum of services needed by indigents in territorial area served by applicant).
 
 
 75
 The regulations promulgated under this statute did require the hospital to furnish a reasonable volume of services, but before 1979, the regulations did not provide any method for allocating the services. See Note, supra, 32 Vand.L.Rev. at 1504. Yet the parties in the present case stipulated that the unsatisfied need was greater than the resources of the hospital, or its obligation under the Hill-Burton Act, could provide. See App. at 53-54. Indeed, one court held that a hospital's allocation method of giving priority to emergency cases first, then urgent cases, then elective care rather than a first-come, first-serve basis was acceptable under the regulations, although neither allocation scheme was mandated. See Gordon v. Forsyth County Hospital Authority, Inc., 544 F.2d 748, 749 (4th Cir. 1976) (per curiam), aff'g on this issue 409 F.Supp. 708 (M.D.N.C.1976).
 
 
 76
 The statute as amended in 1975 did require that Hill-Burton recipients furnish a reasonable volume of free services. See 42 U.S.C. § 300s(3). But again, the statute did not require any particular allocation scheme nor is there any legislative history to indicate that Congress thought the Hill-Burton recipients would be providing free care for all that needed it.[5]
 
 
 77
 Thus, under the posture of the case that was before the District Court, neither the statute nor the regulations provided any certain right to free services to any particular individual. Unlike Greenholtz, there was no statutory or regulatory language that indicated that if someone fit within the category of being indigent, that person should receive free care. Rather the statute here is like that in Meachum. The statute here sets up a possibility of a benefit (free service) while the statute in Meachum set up the possibility of a detriment (transfer to less favorable prison). In neither case did the possibility rest on any mandatory action should certain facts be found; the decisions were discretionary with the officials. True, in the present case, a threshold factual question had to be determined that is, whether or not the applicant for free services fit the qualifications of indigency which are determined by regulation. However, no member of the class, merely by being a member of the class, has any right to free services. Which class members will be benefited was left solely to the discretion of the hospital as long as a certain amount was provided. Thus, although the class may have a right to have the hospital give benefits to some of the class members and thus has standing under the statute, no individual has a legitimate claim to free services such that the procedures provided in the present case infringe a due process right.[6]
 
 
 78
 The new regulations do provide for an allocation mechanism. These regulations provide eligibility requirements and that the Hill-Burton recipients must establish written criteria for allocation of their Hill-Burton resources. See 42 C.F.R. §§ 124.506, 124.507, reprinted in 44 Fed.Reg. 29377 (May 18, 1979). Depending upon whether the written eligibility criteria are subjective or objective, these written criteria may establish some claim of entitlement as did the statute in Greenholtz. However, these new regulations were promulgated in response to the District Court's determination that the plaintiffs had a due process right to free services and that the procedures provided were not adequate. The District Court's determination of a due process right cannot rest upon something promulgated after the court made its decision. This Court holds that under the regulations and statute existing at the time of the lower court's decision, the plaintiffs did not have any due process right to free services and therefore the new regulations were not required in order to protect the plaintiffs' due process rights. We reverse that portion of the District Court's opinion and judgment requiring the adoption of due process procedures. The Secretary was free, of course, to amend HEW's regulations to provide for more process if HEW felt that more process was beneficial and if the new regulations are consistent with the intentions of Congress. We do not consider the validity of the 1979 regulations as that question is not before us. See Note, supra (arguing that the regulations by imposing increasing burdens for providing free care upon facilities receiving Hill-Burton funds are contrary to the original intent of Congress).
 
 C. What Process Is Due
 
 79
 Even if this Court had found that plaintiffs had a legitimate claim of entitlement to free services at Vanderbilt University Hospital, this Court would still reverse the District Court and find that new regulations were not required. Plaintiffs were provided with all process that was due.
 
 
 80
 The 1975 regulations provided for posted notices of the Hill-Burton obligation in various areas of the hospital, see 42 C.F.R. § 53.111(i) (1977), notice in a newspaper of general circulation, see 42 C.F.R. § 53.111(h)(4) (1977), and with billings to patients who were treated for emergency care, see 42 C.F.R. § 53.111(f) (1977). The regulations required written determination whether or not an applicant would be given free services pursuant to the Hill-Burton obligation before the services were rendered, except in the case of emergency patients. See 42 C.F.R. § 53.111(f)(1) (1977). The posted notice stated that any person not satisfied with the results could contact the state Hill-Burton agency. See 42 C.F.R. § 53.111(i) (1977).
 
 
 81
 The District Court held that these procedures were not adequate to give plaintiffs notice and an opportunity to be heard. The court held that due process required meaningful notice of the written eligibility criteria, written notice of the reasons for denial of free services detailing the reasons, review by a decision-maker who had not participated in the initial decision, and an effective opportunity to present affirmative evidence and refute adverse evidence. The District Judge required the facility to at least give actual notice to those who are denied free services and for whom free or below-cost care elsewhere is not available. See 453 F.Supp. at 424-29.
 
 
 82
 The Supreme Court decided in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), what process is due when the state welfare department terminates benefits. The state laws had provided that a beneficiary would be given an interview by a social worker, notice of reasons for termination, and review by a supervisor upon a written request before termination and a "fair hearing" after termination. The Court held this was not enough as termination deprived eligible persons of the very means by which to live while challenging the decision and as in this particular situation a written review was not adequate. See 397 U.S. at 264, 268-69, 90 S.Ct. at 1018, 1020-21.
 
 
 83
 In another situation, the termination of social security benefits, the Court determined that an oral hearing prior to termination was not necessary. See Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process requires some kind of a hearing before an individual is finally deprived of a property interest, but the manner of giving the individual a meaningful opportunity to be heard depends upon the competing interests: the private interest affected, the risk or deprivation through the existing procedures and the probable value of alternative procedures, and the government's interests. See 424 U.S. at 333-35, 96 S.Ct. at 901-903. For termination of social security benefits, which are not as essential as welfare benefits, a determination based upon a written record prior to termination, with an opportunity for review after termination, was sufficient.
 
 
 84
 Goldberg and Mathews are distinguishable from the present case in an important aspect. Both those cases involve the government taking away a benefit which the beneficiary had previously been enjoying after a determination of entitlement. In the present case, nothing that the plaintiffs already had is being affected by the regulations; what is affected is a future benefit that is, the future provision of free services.
 
 
 85
 The distinction between being deprived of an interest one already has and being denied a conditional interest one desires was recognized by the Supreme Court in Greenholtz, supra. The plaintiffs' claims for parole release thus did not invoke the same due process considerations as claims against parole revocation. The prisoners in Greenholtz were given an opportunity to be heard during their initial interview with the parole board. If parole was denied, the parole board gave reasons, but did not have to state what evidence it relied upon for its decision. Apparently there was no opportunity for review of denial of parole after the initial interview by an independent supervisor or an evidentiary hearing. See 442 U.S. at 4-5, 15, 99 S.Ct. at 2102-2103, 2108. Given the interest at stake the denial of a conditional interest, that of parole release the Court held the prisoners had all the process that was due. See 442 U.S. at 16, 99 S.Ct. at 2108. The Court did not consider what kind of notice there was or whether it was sufficient.
 
 
 86
 In the present case, under the 1975 regulations, notice was given by posting notice. A written determination was made. The posted notice indicated that anyone dissatisfied with the results could contact the state Hill-Burton agency. Considering the conditional nature of the benefit and the result in Greenholtz, this Court holds that under the 1975 regulations, the plaintiffs had all the process that was due, even if plaintiffs had a legitimate claim of entitlement to free services. The new regulations are perhaps beneficial and more equitable as every person is given actual notice of the Hill-Burton Act and the hospital's obligation thereunder, and perhaps these procedures are required if the new regulations create a legitimate claim of entitlement, but these issues are not before this Court. This Court holds that the Secretary, under the old regulations and statute, was not required to promulgate new regulations affording more process to applicants seeking free services under the hospital's Hill-Burton obligation.
 
 
 87
 The order of the District Court is affirmed in part, modified in part, and reversed in part.
 
 
 
 *
 Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 As part of another revision of our public health laws, Congress repealed 42 U.S.C. §§ 300o to 300o -3 and 300p to 300p-3. See Legislative Note following these sections in 42 U.S.C.A. (Supp.1974-79). However, the requirement that the Secretary promulgate regulations to require recipients of Hill-Burton funds to comply with assurances and demonstrate compliance was recodified at 42 U.S.C. § 300s(3). The requirement that the Secretary investigate and enforce compliance with a provision for private enforcement, was recodified at 42 U.S.C. § 300s-6. Congress did not intend to repeal the requirements under the Hill-Burton Act for facilities funded under its authority. See S.Rep.No. 96-96, 96th Cong., 1st Sess., reprinted in (1979) U.S.Code Cong. & Admin.News 1306, 1314, 1396; Conf.Rep.No. 96-420, 96th Cong., 1st Sess., reprinted in (1979) U.S.Code Cong. & Admin.News 1422, 1462 (House did not have provisions repealing sections; House conformed to Senate bill)
 
 
 [2]
 For a helpful chart comparing the changes in the provisions of the Hill-Burton regulations, see Note, supra, 32 Vand.L.Rev. at 1500-10
 
 
 [3]
 The posted notices were required by the 1975 regulations. See 42 C.F.R. § 53.111(i) (1977); Note, supra, 32 Vand.L.Rev. at 1502
 
 
 [4]
 Several commentators who have examined the Hill-Burton Act and its accompanying regulations have concluded that Congress did intend through the Hill-Burton Act to provide services for the indigent. See Rose, Federal Regulation of Services to the Poor Under the Hill-Burton Act: Realities and Pitfalls, 70 Nw.U.L.Rev. 168, 169-70 (1975); Rose, The Duty of Publicly-Funded Hospitals to Provide Services to the Medically Indigent, 3 Clearinghouse Rev. 254 (1970); Rosenblatt, Health Care Reform and Administrative Law: A Structural Approach, 88 Yale L.J. 243, 268-69 (1978). However, one commentator disagrees that Congress intended to create through the Hill-Burton Act a partial solution to the problem of providing hospital services to the indigent. See Note, Due Process for Hill-Burton Assisted Facilities, 32 Vand.L.Rev. 1469, 1470-79 (1979)
 This Court has made an independent review of the legislative history of the Hill-Burton Act and must conclude that the history of the 1946 Act, in which the reasonable volume assurance first appeared, does not indicate that Congress necessarily wanted the hospitals to provide free services and thereby take care of the indigent and it surely did not intend to create a right to free services in those indigents residing in the territorial area serviced by the hospital.
 The "reasonable volume" of free services provision first appeared as § 622(f) of the Hospital Survey and Construction Act, Pub.L. No. 725, 60 Stat. 1040 (1946). The Act's infancy was as S.191, discussed in Hospital Construction Act: Hearings on S.191 Before the Senate Comm. on Education and Labor, 79th Cong., 1st Sess. (1945). The bill at that time had no provision for hospitals providing for free services. In § 622(a)(3), the bill required that the state plan must, to be approved, set forth a hospital construction program which is sufficient to provide the necessary facilities for furnishing adequate hospital care to all the people of the state. See id. at 3. The purpose of the bill was to provide construction for necessary facilities to service all of the people and to assist the states in surveying the need for facilities. See id. at 1. The co-sponsor of the bill, Senator Hill, explained the intent as to provide for construction of hospital facilities where there is a demonstrable need, planned as part of a long-range health development. The construction would be controlled through state agencies, not the federal government. See id. at 8. He, among others, noted the pressing need for more hospital beds. See id. at 6; id. at 37-38 (Rev. Schwitalla); id. at 102-03 (Dr. Atwater); id. at 119 (Dr. Stevenson); id. at 125 (Dr. Eliot); id. at 179 (Dr. Mott); id. at 208 (Dr. Poe); id. at 294 (W. R. Ogg).
 Concern was expressed that services be provided for indigents, but the bill did not provide for those services. The bill was merely a preliminary step to provide the necessary facilities. See id. at 10-11 (American Hospital Association); id. at 30, 35 (Dr. Smelzer); id. at 48-49 (American Hospital Association); id. at 70 (Sen. Ellender); id. at 104 (American Public Health Association); id. at 267, 272-73 (letters noting the lack of provision for care to the indigent). At one point Senator Pepper questioned Dr. Smelzer whether or not the bill was leaving it to Congress to determine by further legislation how the federal government might help make facilities available to all the people. When Dr. Smelzer answered in the affirmative, Senator Hill responded by paying tribute to the subcommittee that had studied the problem and noted the challenge raised that the federal government do something not only for the hospitalization, but also for the medical care of all the people. See id. at 35. Later Senator Pepper noted that the objective was to provide needed hospital and medical services to the people and that such a program, involved two steps: one was the provisions of the physical equipment, the other was working on some plan so all could use the facilities. The bill only referred to the first part of the program. See id. at 64-65.
 Having the hospital provide free services was not contemplated by the original bill. Indeed, some were afraid the hospitals would not be able to be maintained and operated without some sort of federal aid. See id. at 11 (American Hospital Association); id. at 66 (Sen. Johnston and Dr. Parran); id. at 130-31 (Dr. Eliot); id. at 377 (Mr. Ginn). Senator Taft insisted that before the hospitals were built, the states give assurance that the hospitals would be maintained. He thought it foolish to build a hospital for a state if the state was not prepared to support it. See id. at 26. In addition, see id. at 66 (Dr. Parran).
 Several suggestions were made at the hearings to provide for indigents and those unable to pay. Some favored some form of health insurance or federal funds. See id. at 31 (Dr. Smelzer); id. at 65 (Dr. Parran); id. at 70 (Sen. Johnston, Dr. Parran); id. at 131 (Dr. Eliot); id. at 211 (Dr. Poe); id. at 238 (Mr. Lamb). One witness, in response to questions by Senator Pepper, thought Blue Cross was adequate for some but lower income people could not afford it. This witness preferred a voluntary insurance plan rather than compulsory payroll deduction and federal subsidies for low income people. See id. at 170, 173-74 (Joseph Fichter). In addition, see id. at 212 (Dr. Poe); id. at 236-38 (Robert Lamb). But see id. at 263 (Russell Smith thinks voluntary insurance is too costly). Another suggestion was that the state plan should provide for services for the poor through state, private, and county funds. See id. at 211-12 (Sen. Ellender). In addition, see id. at 213 (Dr. Poe suggested using sales taxes). Senator Pepper also suggested various means of government funding or voluntary health insurance. See id. at 212.
 Whether any obligation should be put on the hospitals built with the Hill-Burton funds was only briefly discussed. Dr. Mott suggested the hospitals have an obligation to service the indigent. Senator Taft mentioned that all of them do serve indigents and questioned whether or not there should be a requirement to serve a certain number of patients without charge. Senator Pepper replied he thought that the indigent problem should definitely be provided for by the city, county, state, or federal authority, rather than the individual hospital. Senator Ellender stated that their primary purpose was to devise the means to take care of those who cannot take care of themselves. He supported the bill which provided for federal aid to build hospitals to make it easy for the community to give aid to the indigent. See id. at 190-91. Later on during the hearing, Mr. Ogg objected to the stated objective of providing services to all the people of a state as requiring the state to submit a plan to completely fill the gap, which would require enormous financial outlays that the state may not have. Senator Hill replied that that was not the intention. Supplying facilities to meet the needs of all the people was the proposal. The states must make surveys and create plans to meet the over-all goals and objectives. However, that did not mean the states would not get help unless they were ready right then to meet those goals fully and completely. See id. at 301.
 The provision that regulations may require the applicants to provide a reasonable volume of services to those unable to pay appeared in the bill as it was submitted to the Senate. See S.Rep.No. 674, 79th Cong., 1st Sess. 9 (1945); 91 Cong.Rec. 11710 (Dec. 10, 1945) (§ 622(f) of S.191). The report stated that the bill had two purposes to assist the states in hospital and public health facility needs through state-wide surveys and to aid in the construction of necessary facilities. The bill was designed to strengthen the national health through the provision of more adequate hospital facilities. See id. at 2, 7. The committee recognized that the bill dealt only with construction of the physical facilities and left the problem of maintenance and operation for separate legislation. See id. at 6. The committee noted that the proposals in the bill did not attempt to meet all the problems of national health. The bill was designed to be a first step toward proper distribution of health services by furnishing the facilities that would attract doctors to underserved areas. The problem of furnishing services to all those unable to pay was not mentioned. See id. at 15. The limited purpose of the bill was recognized in the Senate floor debates, see 91 Cong.Rec. 11714 (Dec. 10, 1945) (Sen. Hill); id. at 11717 (Sen. Murray); id. at 11795 (Sen. Wagner); id. at 11732 (Sen. Johnston). The problem of providing services for those who could not pay for them was noted, but, as in the hearings, the solutions proposed were for further legislation dealing with health insurance or federal or state aid to maintain and operate the hospital. See id. at 11720 (Sen. Murray); id. at 11723 (Sen. Taft); id. at 11795 (Sen. Wagner). The bill passed the Senate December 11, 1945 without amendment to the free services provision.
 The House Subcommittee considered the bill as passed by the Senate, including the free services provision. See Hospital Construction Act: Hearings on S.191 before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 79th Cong., 2d Sess. 1, 4 (1946). The discussion during the hearings was similar to the discussions during the Senate hearings (indeed many of the same witnesses appeared). The witnesses noted that many people would be unable to pay for services. One witness said that under the bill that the hospital facilities established under the bill would be for the care of all the people. See id. at 84 (Dr. Sensenich from the American Medical Association). Who should pay for the services for those unable to pay was not dealt with in the bill; this defect caused several witnesses to suggest that the bill was but a first step and more legislation would be needed. See id. at 44 (American Hospital Association); id. at 52 (Dr. Smelzer, Rep. Harris); id. at 78-79 (American Protestant Hospital Association); id. at 142 (Dr. Atwater). Others would have relied upon state or local control, see id. at 128 (Mr. Ogg), or cooperative payment plans, see id. at 151 (Ludwig Anderson), rather than federal funding to maintain the hospitals. One witness objected to the provision exempting hospitals from the free services provision if that was financially impractical, as those unable to pay were the very patients who were most in need of hospital care. See id. at 147 (Dr. Boas). Another witness noted that the provisions of the bill would not meet more than 20% of the actual estimated need. See id. at 150 (Mr. Anderson).
 The House Subcommittee proposed a few modifications in the Senate bill by changing the ratio of matching funds that the federal government would provide. See H.R.Rep.No. 2519, 79th Cong., 2d Sess. 1, 2 (1946). However, the free services provision was unchanged from the Senate bill. See id. at 7-8, 17; 92 Cong.Rec. 10205 (July 26, 1946). Representative Bulwinkle, explaining the bill on the floor of the House, emphasized the need for hospital beds. He explained that the bill did not provide for maintenance of the institutions. He was concerned that if maintenance was included, extensions of the program would be continually sought and he did not think the program should be carried out indefinitely. See 92 Cong.Rec. 10207-08 (1946). The House passed the bill as modified by the House Subcommittee without any amendment to the free services provision. See 92 Cong.Rec. 10238 (July 27, 1946). The Senate then passed the bill as it had been amended by the House. See 92 Cong.Rec. 10523 (July 31, 1946).
 The legislative history of the free services provision of the Hill-Burton Act of 1946 demonstrates that Congress had no intention of requiring the hospitals to furnish a certain amount of free care. That was merely a suggestion that the Surgeon General was authorized to implement. Congress certainly had no intention of creating in the Hill-Burton Act a right to free services at hospital which had received Hill-Burton funds for construction for every person unable to pay for health services. Thus, the statute enacted in 1946 did not create any right to entitlement in free services at Hill-Burton recipient hospitals.
 
 
 [5]
 The National Health Planning and Resources Development Act of 1974, enacted January 4, 1975, reflected a change in attitude towards the free services provision from the 1946 Act. The Secretary of HEW was now required to promulgate regulations which would require the hospital receiving Hill-Burton funds to comply with their free care assurances and prove such compliance. See Act of Jan. 4, 1975, § 1602(6), 88 Stat. 2258-59. The 1974 Act had its genesis in hearings held in the Senate in March, 1974. The existing programs, including Hill-Burton, were slated to expire June 30, 1974. Senator Kennedy thought enough worthwhile projects remained to expend the remaining funds. Furthermore, he thought national health insurance would be enacted shortly and felt that a mechanism for identifying and realizing national health goals was essential. Hence the need for more legislation. See National Health Planning and Development Act, 1974: Hearings on S.2994, S.3139, S.2796 before Subcomm. on Health of the Senate Comm. on Labor and Public Welfare, 93rd Cong., 2d Sess. 1, 2 (1974). Senate related legislation concerning changes in the Hill-Burton Act were later introduced. See id. at 522 (Sen. Kennedy); id. at 764 (Gov. Philip Noel). However, this Court was unable to find any published record of hearings on the related legislation. The March 1974 hearing dealt mainly with the need for planning agencies. The problem of those unable to pay was mentioned, but was considered as a further need for efficient planning and as something to be included in the state plans. See id. at 189-90 (Mr. Carlucci, Sen. Kennedy)
 Meanwhile, a similar, but independent House bill was introduced. The House bill noted the need for planning as some areas still need modernization of facilities, but others had too many beds. See H.R.Rep.No. 93-1382, 93rd Cong. 2d Sess. 27, 31-34 (1974). The House bill provided for an extension of the Hill-Burton Act, although the changes to that Act were more modest than proposed changes to other acts. See id. at 3, 43. A new section authorized the Secretary to also require that a state agency secure from an applicant assurances that a reasonable volume of services would be provided to those unable to pay. This section, however, was not intended to change the application of pre-existing authority to existing projects. See id. at 94.
 The Senate bill when it emerged from the committee had the mandatory language regarding enforcement of the free services provision. See 120 Cong.Rec. 37206 (1974). The Senate Report mentioned that the Hill-Burton Act had been amended to provide for a new special projects grant program and the need for modernization, although the initial need for additional hospital beds had disappeared. See S.Rep.No. 93-1285, 93rd Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Admin.News 7842, 7843, 7864, 7897-98. The report cited a GAO report which stated that the implementation of the free service requirement was in its infancy at the state agency and local facility level. The report noted that none of the states had active programs for monitoring compliance with the requirement; most relied upon complaints. The report noted the sorry performance by the Department of HEW and the state Hill-Burton agencies in enforcing the law which had been in existence for over 20 years. The legislation contained provisions to strengthen enforcement of those assurances. See id. at 7900.
 When the Senate bill was introduced to the floor of the Senate by Senator Kennedy, no mention was made of the free services assurances. See 120 Cong.Rec. 37212-13 (Nov. 25, 1974). Indeed, Senator Kennedy repeated his hopes of having national health legislation in the near future. See id. at 37213. The Hill-Burton Act was still necessary to provide for needed modernization of facilities. Senator Randolph opined that the legislation would help assure that quality health care would be available to all Americans. See id. at 37243. However, he did not mention who should pay for it. Later in the debates, Senator Kennedy noted the desperate financial condition of the hospitals in the major industrial areas. See id. at 37241.
 The Conference Report noted that both bills required the state plans to provide for adequate facilities to furnish needed health services for persons unable to pay. See H.R.Rep.No. 93-1640, 93rd Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Admin.News 7971, 7994. In addition, the House bill, but not the Senate bill, specified regulations to require the state plan to furnish facilities for all persons residing within the states and that the Secretary may, by regulation, require the state agency to secure "reasonable volume" of free services assurances. The Conference conformed to the House on this. The Conference Report noted that the Senate bill, but not the House bill, required the Secretary by regulation to prescribe the manner in which the assisted facilities were to comply with their assurances and demonstrate compliance. The Conference Report conformed to the Senate bill on this. Id. at 7994-95.
 The Conference bill was passed by both Houses without further discussion on the free services assurances. See 120 Cong.Rec. 41175 (Dec. 19, 1974); id. at 41855 (Dec. 20, 1974).
 As the above legislative history shows, the 1974 Congress intended that every facility which had received Hill-Burton assistance be required to comply with its free services assurances and be required to prove compliance. The state plans had to provide for services for those unable to pay, but there is no indication that the state plan must be fully operable before further Hill-Burton monies would be granted to improve facilities. Nor is there any indication that the hospitals receiving the Hill-Burton funds in the past or the future would alone be providing for that obligation through their free service assurances, rather than through other state supported mechanisms. This Court cannot conclude from the scant legislative history available that Congress intended by its strengthened free services requirement that every person unable to pay for hospital services had a right to free services at a hospital which had received Hill-Burton funds.
 
 
 [6]
 The Seventh Circuit has held that applicants for Hill-Burton services have a due process right to those services such that they may sue the Secretary of HEW for failing to promulgate regulations which would protect that right. See Davis v. Ball Memorial Hospital Ass'n, 640 F.2d 30 at 43 (7th Cir. 1980). The Court reasoned that due process entitlement was "akin" to notions of standing and adopted as its definition of entitlement the definition proposed by Judge Hufstedler in her dissenting opinion in Geneva Towers Tenants Organization v. Federated Mortgage Investors, 504 F.2d 483, 493 (9th Cir. 1974). Judge Hufstedler defined entitlement as a legally enforceable interest in receiving a governmentally conferred benefit, the initial receipt of which is conditioned upon the existence of a controvertible and controverted fact. See Geneva Towers, supra, 504 F.2d at 495-96 (Hufstedler, J., dissenting). That the plaintiffs had a legally enforceable interest to force the hospitals to provide some volume of free services was clear from the statute. See 42 U.S.C. § 300p-2(c) (recodified at 42 U.S.C. § 300s-6). However, that the plaintiffs were entitled to free services in the Seventh Circuit's decision was based upon an assumption this Court cannot accept. Said the Davis Court:
 the regulations appear to anticipate that granting an application (for Hill-Burton free services) will be the usual course, perhaps because the customary level of compliance is set high enough to ensure that most applicants will receive services.
 Davis, supra at 42-43.
 In the present case, the parties stipulated that the need for free services in the territorial area served by Vanderbilt Hospital was greater than the hospital's Hill-Burton obligation. See App. at 53-54. Moreover, the legislative history of the original act indicates that the legislators knew that the need was greater than the provisions the act created. See Footnote 4, supra. Therefore, this Court cannot follow the Seventh Circuit and find a due process right to free services in the present case.