Dr. Gadson J. TARLETON,
Plaintiff-Appellant,

v.

MEHARRY MEDICAL COLLEGE, et al.,
Defendants-Appellees.

No. 82–5449.

United States Court of Appeals,
Sixth Circuit.

Sept. 20, 1983.

Avon N. Williams, Jr., argued, Williams & Dinkins, Nashville, Tenn., for plaintiff-appellant.

Wilson Sims, Bass, Berry & Sims, Stafford McNamee, argued, Nashville, Tenn., for defendants-appellees.

Before MERRITT and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

Plaintiff-Appellant, Dr. Gadson J. Tarleton, a black physician specializing in radiology, was formerly employed as a faculty member of defendant-appellant Meharry Medical College, a predominantly black, private, not-for-profit educational institution in Nashville, Tennessee. Plaintiff's association with Meharry was terminated after he refused to join a medical practice plan prepared by the Meharry faculty which regulated patient fees charged by salaried faculty members who conducted their own private practice on the campus using facilities, personnel, and drugs Meharry supplied to them free of charge. Plaintiff brought this suit in the United States District Court for the Middle District of Tennessee, Nashville Division, seeking damages and injunctive relief against Meharry and certain of its officers, trustees, and employees for alleged violations of § 1 and § 2 of the Sherman Act, 15 U.S.C. § 1 and § 2; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, and 1988; the First, Fifth, Thirteenth and Fourteenth Amendments of the United States Constitution; various Tennessee antitrust statutes, Tenn.Code Ann. §§ 69–101 *et seq.,* and the Tennessee Professional Corporations Act, Tenn.Code Ann. §§ 48–2001 *et seq.* The district court dismissed the Sherman Act claims for lack of jurisdiction, granted summary judgment in favor of the defendants on all other federal claims, and declined pendent jurisdiction over the state claims.

We affirm in part, reverse in part, and remand for further proceedings by the district court.

I

The facts, as found by the district court, are as follows:

Meharry Medical College [hereinafter "the College" or "Meharry"] is a private, not-for-profit educational institution located in Nashville, Tennessee. From 1949 until July 1, 1977, plaintiff was a full-time faculty member of the College, and for most of that period, was Chairman of the Department of Radiological Service of Hubbard Hospital, a full service teaching hospital which is owned and operated by the College on the Meharry campus.

Meharry's full-time faculty may conduct the private practice of medicine by seeing patients both at the College and at their own private offices for which they charge professional fees. Prior to the adoption of the Meharry Medical Practice Plan [hereinafter "the Plan"] these fees were retained in their entirety by the individual physicians most of whom conducted their private practices from facilities located on the Meharry campus. These facilities were supplied to the physicians free of charge incident to their teaching duties along with medical and non-medical support personnel paid by the College and supplies and equipment purchased by the College.

Beginning in the late 1960's and early 1970's, the Meharry administration determined that the College could not continue to subsidize its faculty members in their private practices. Accordingly, the faculty and administration developed and considered several alternative proposals for a medical practice plan that would allow full-time faculty members to continue their private practices, but would provide some reimbursement to the College for the overhead it was contributing to these private practices.

In 1974, the Department of Health, Education and Welfare [hereinafter "HEW"][1] advised the College that if it were to con-

tinue to receive federal funds it must adopt a medical practice plan. As Meharry was receiving approximately sixty percent (60%) of its revenues from federal funds, termination of that funding would more than likely have resulted in the financial collapse of the college. HEW's objections were directed to what it characterized as double payment of federal funds to faculty members for performing a single function. HEW's position was that faculty members often treated their private patients in the presence of their medical students using the treatment as an example to aid instructions. The professor/physician would then receive federal Medicare or Medicaid funds in payment for patient treatment in addition to receiving a teaching salary heavily subsidized by HEW funds for performing the identical function.

At approximately the same time that HEW took a firm position in this matter, the Board of Accreditation of the American Association of Medical Colleges issued a directive requiring the College to adopt a medical practice plan or lose its accreditation. As a result of the directives of HEW and the Board of Accreditation, the Board of Trustees of the College mandated that the full-time faculty members adopt and implement a medical practice plan in 1974. After consideration of alternative plans, the Plan at issue was adopted by the faculty members, approved by the Board of Trustees and appropriate college officers. The Plan was put into operation on February 1, 1975 and subsequently amended on June 28, 1976. All full-time faculty members of the College who engaged in the private practice of medicine were required to be members of the Plan. All fees collected by the participating faculty members had to be endorsed to the college. These fees in turn were to be used to pay the expenses of delivery of health care services, including salaries of the participating faculty members, salaries of medical support personnel, cost of billing and collection, malpractice insurance premiums, costs of supplies, rental of occupied space, and other overhead expenses.

Compensation of faculty member participants in the Plan is based on a guaranteed salary component and an incentive component. The guaranteed salary is based on the history of collections from private practice generated by the individual participant. This component is paid regardless of revenues generated in the present year. The incentive component is based upon a percentage of revenues generated in the present year after guaranteed salary and support costs are paid. If a particular department generates revenues sufficient to cover all guaranteed salaries and support costs for the department, the office of the Dean of the School of Medicine and the department divide the excess funds. The College benefits from the Plan because it is reimbursed by the participants in the Plan for support services necessary for their individual private practices, which previously had been supplied by the College without charge to the participants. The Plan also provides a mechanism for receipt of excess practice funds by the College.

Despite provisions in the Plan which called for standard fees to be set by the Executive Committee of the Plan, the Plan has been administered from its inception in such a way that the Executive Committee never exerted any influence or control over the fixing of professional fees charged by a participating faculty member. Each participant establishes his own fees and reports these fees to the business office of the Plan, which in turn conducts all billing and collection services. The Executive Committee of the Plan, by resolution dated November 8, 1977, recommended to the membership of the Plan, that the provisions in the Plan relating to standard fees be deleted.

At the time the Plan was instituted, plaintiff refused to subscribe. He testified that his objections to the Plan included: a basic philosophical objection; loss of freedom to manage his fees; the Plan restricted his decisions as to what dispositions to make of his money; the Plan misrepresented services given to the patient; and the Plan increased the cost of medical care for patients. Other evidence demonstrated, however, that the management of fees is not in any way affected by the Plan and, in fact,

the Plan has no control over the individual physician's setting of fees or management of his revenues. In addition, evidence showed that each physician treats his patients as his own without any control from the business office of the Plan, the Executive Committee of the Plan, or the College. The patient is in all respects the individual patient and client of the physician. The Plan simply collects the medical fees and arranges for disbursement of those fees to pay all the costs of the medical services. Evidence also failed to show that physician fees have increased (or, indeed, changed at all) since the beginning of the Plan or that any alleged increase or decrease was a result of the imposition of the Plan.

After continued negotiations over a period of two years, it became apparent that discussions with the plaintiff were not producing results and the Dean of the School of Medicine, at the instruction of the Board of Trustees of the College, informed the plaintiff on June 6, 1977, that he would no longer be retained on full-time faculty status after July 1, 1977. At all times during the negotiations and at the time plaintiff was notified of his termination, he had the option of becoming a member of the Plan in accordance with the instructions of his employer and retain his full-time faculty status. Instead plaintiff elected to surrender his full-time faculty status and refused to become a part of the Plan. Incident to his surrender of full-time faculty status, plaintiff also surrendered his tenure rights and his positions as Chairman of the Radiology Department of the College and Chief of Radiological Services of Hubbard Hospital. After plaintiff's resignation, he filed this suit. Thereafter on May 24, 1978, plaintiff's staff privileges at Hubbard Hospital were totally terminated.

Plaintiff's original complaint alleged that the Plan provided for an illegal price fixing scheme resulting from an alleged conspiracy of the defendants to violate the Antitrust Laws. (Complaint, ¶ 13, filed Sept. 19, 1977). The original Plan contained a

clause which stated that "the standard fees for professional services rendered in the care of patients by a participating member shall be as established by the Executive Committee of the Meharry Medical Practice Plan". Plaintiff also asserted various pendent state claims in this original complaint.

After an evidentiary hearing from which the above factual findings were gleaned, plaintiff's notice [sic, motion] for a preliminary injunction was denied. The Court found, *inter alia,* that plaintiff had failed to prove that the fees had been affected in any way by the Plan and that he had not demonstrated a reasonable probability of success on the merits. Pendent jurisdiction on the state claims was declined on the ground that plaintiff had failed to state a substantial federal claim.

Plaintiff then filed a "Second Amendment and Supplement To Complaint" (filed March 27, 1979) adding several new causes of action including claims arising under 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, and 1988. He also asserts claims arising under the First, Fifth, Thirteenth, and Fourteenth Amendments to the United States Constitution. This amended complaint also includes new claims arising under "15 U.S.C. §§ , *et seq.*" Apparently plaintiff intends this rather broad statement to more specifically include Sections 1 and 2 of the Sherman Act.

[1] This department has recently been split into two separate agencies: (1) the Department of Education, and; (2) the Department of Health and Human Services.

(Appendix 681–86)

## II

### A

Defendants moved for summary judgment on the federal antitrust claims on the grounds that the district court lacked subject matter jurisdiction and the claims failed as a matter of law because plaintiff did not satisfy the interstate commerce requirement of the Sherman Act.[1] Considering the motion under Rule 12(b)(1) rather

1. § 1 of the Sherman Act, 15 U.S.C. § 1, provides, in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint

than Rule 56 of the Federal Rules of Civil Procedure, the district court: (1) determined that plaintiff sought to invoke the "effect on" interstate commerce test rather than the "in" interstate commerce test for Sherman Act jurisdiction, *see McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 241–42, 100 S.Ct. 502, 508–09, 62 L.Ed.2d 441 (1980), (2) interpreted ambiguous language in *McLain* to mean that a Sherman Act plaintiff must demonstrate that the alleged illegal conduct, as opposed to the defendant's general business, substantially affects some channel of interstate commerce,[2] (3) reviewed the pleadings and evidence, and concluded:

> of trade or commerce *among the several States* . . . , is declared to be illegal. (emphasis added)
>
> § 2 of the Sherman Act, 15 U.S.C. § 2, provides, in pertinent part:
>> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any parts of the trade or commerce *among the several States* . . . shall be deemed guilty of a felony . . . . (emphasis added)

2. In *McLain,* the plaintiff's complaint alleged that real estate brokers in the New Orleans area had agreed to a fixed rate of brokerage commissions on sales of residential property in violation of Section 1 of the Sherman Act, and that this conduct affected the frequency and terms of home sales financed through interstate channels. The district court dismissed the complaint for failure to establish the interstate commerce component of Sherman Act jurisdiction and the Fifth Circuit affirmed. In reversing the dismissal, Chief Justice Burger wrote for a unanimous Court:

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases. See *American Tobacco Co.*

All of the [plaintiff's] allegations are statements that the defendants' business generally is engaged in interstate commerce. Plaintiff has failed to identify any relevant area of interstate commerce potentially affected by the defendants' activities in implementing the Plan or in revoking plaintiff's staff privileges. Even if plaintiff intends [his] allegations of defendants' general business activities to be the "relevant channels" of interstate commerce, he has failed to assert how implementation of the Plan or revocation of his staff privileges affects these activities—there is no "nexus". Moreover, another district court has held that

> *v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 225, n. 59, 60 S.Ct. 811, 846, n. 59, 84 L.Ed. 1129 (1940).

*McLain, supra,* 444 U.S. at 242–43, 100 S.Ct. at 509–10.

Courts differ over the meaning of this language. In *James R. Snyder v. Associated General Contractors of America,* 677 F.2d 1111, 1115 n. 3 (6th Cir.1982), this court observed:

> We are aware that a conflict exists between the circuits regarding *McLain.* The Ninth Circuit has held that Sherman Act jurisdiction exists when *any* business activity of a defendant affects interstate commerce. *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094 (9th Cir.1980). Under a more conservative view of the reach of the Sherman Act, the Tenth Circuit has taken the position that a defendant's *illegal* activities must affect interstate commerce for jurisdiction to be present. In the instant case, because the evidence supports a finding that defendants' alleged illegal actions affected interstate commerce, we need not decide whether Sherman Act jurisdiction could be founded solely on proof that defendants' general business activity affects interstate commerce.

The Tenth Circuit opinion referred to is *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 720–25 (10th Cir.1980). The Ninth Circuit's liberal reading of *McLain* has also been rejected by the First Circuit in *Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank, N.A.,* 649 F.2d 36, 44–45 (1st Cir.1981), and by the Second Circuit in *Furlong v. Long Island College Hospital,* 710 F.2d 922 (2d Cir.1983). We again decline to decide this question because we find, *infra,* that plaintiff's complaint satisfies Sherman Act jurisdictional requirements under either a broad or narrow reading of *McLain.*

the appropriate focus in staff privilege cases is on how the defendants' alleged illegal activities affect the plaintiff's role in interstate commerce. *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Ctr.,* 536 F.Supp. 1065 (E.D.Pa., 1982). Plaintiff makes no mention of any activities of his own in interstate commerce, much less how those activities are affected by defendants' alleged unlawful acts. In sum, plaintiff's complaint fails to meet even the most minimal standards for properly pleading a cause of action under the Sherman Act. The complaint as twice amended fails to allege any legally relevant channel of interstate commerce, any effect on interstate commerce, and any connection between the challenged actions of defendants and interstate commerce. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), will be granted as to the Sherman Act claims and this cause will be dismissed without prejudice.

(Appendix 696–97)

### B

■ The reach of the Sherman Act extends as far as Congress' power to regulate interstate commerce. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 201, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974); *James R. Snyder Co. v. Associated General Contractors of America, supra,* at 1114. Sherman Act jurisdiction exists when an activity is "in" interstate commerce or, although local in nature, has a "substantial effect" on interstate commerce. *McLain, supra,* 444 U.S. at 242–43, 100 S.Ct. at 509–10; *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976). There is no talismanic test for the adequacy of the interstate commerce nexus under the "effects" test; jurisdiction must be determined by a case-by-case analysis of the relevant economic facts. *Heille v. City of St. Paul, Minnesota,* 671 F.2d 1134, 1136 (8th Cir.1982); *Crane v. Intermountain Health Care, Inc., supra,* at 727; *Western Waste Service Systems v.*

*Universal Waste Control, supra,* at 1098–99; *J.P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.,* 565 F.2d 264, 269 (3d Cir.1977). Defendants' activities allegedly infected by a price-fixing conspiracy must as a matter of "practical economics" substantially affect interstate commerce. *McLain, supra,* 444 U.S. at 246, 100 S.Ct. at 511.

■ To establish jurisdiction a plaintiff must allege in the pleadings the critical relationship between local activity and a channel of interstate commerce, and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings that the jurisdictional requirements of the Sherman Act are satisfied. *McLain, supra,* at 246, 100 S.Ct. at 511, *quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In antitrust cases, "where the proof is largely in the hands of the alleged conspirators," dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. *Hospital Building Co. v. Rex Hospital Trustees, supra,* 425 U.S. at 746, 96 S.Ct. at 1853 *quoting Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Under this "rigorous standard", *id.,* a 12(b)(1) motion should not be granted if there are facts pleaded from which jurisdiction can be inferred. *In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981); *Crane v. Intermountain Health Care, Inc., supra,* at 725; 5 C. Wright & A. Miller, *Federal Practice And Procedure* § 1350, at 552 (1969).

Application of these principles to the instant case leads us to conclude the district court erred in dismissing the Sherman Act claims for lack of subject matter jurisdiction. The following pleadings and evidence are relevant. Plaintiff's original Complaint alleged, in pertinent part:

10. The defendants are engaged in interstate commerce, by *inter alia,* receiving a substantial amount of the funds for the operation of said Meharry Medical College through interstate commerce and through the receipts by the physicians who are members of said Medical Prac-

tice Plan of funds, which funds are endorsed over to said defendants, through interstate commerce.

(Appendix 4). Plaintiff's first Amended Complaint alleged, in pertinent part:

10a. The plaintiff and the members of his class and the defendant, Meharry Medical College have in the past and are now in the business of providing professional medical services to the Nashville, Davidson County, Tennessee community and said plaintiffs and defendants have in the past and are now competing for patients to provide said services to.

. . . .

10c. The defendant, Meharry Medical College, by requiring the plaintiff and the members of his class to enter into the Meharry Medical Practice Plan, eliminates all competition for patients and eliminates all independence in the charging of fees.

10d. The members of the plaintiffs' class who have left their employ at Meharry Medical College and who have set up private offices off the campus of Meharry Medical College have also been adversely affected by the Medical Malpractice Plan (sic) in that said plan allows Meharry to monopolize the medical business in that part of the community and said plan causes the prices for medical services to remain at an artificial level in that said members of plaintiff's class cannot effectively charge higher prices and compete for the same patients.

10e. Because of the Meharry Medical Practice Plan the fees charged for medical services administered by physicians associated with and members of said medical plan will be fixed and maintained at an artificial level.

(Appendix 22–23). Plaintiff's second Amended Complaint alleged, in pertinent part:

22. After the filing of this lawsuit the defendants proposed and are considering the adoption of a revised MMPP which, on information and belief, eliminates the explicit price fixing clause contained in the MMPP in effect when this suit was filed, and provides that medical fees became the property of MMPP rather than defendant Meharry Medical College. However, on information and belief, said revised MMPP still contains the following features which constitute restraint of trade or commerce in violation of the statutes set out in Sections I and II of the original Complaint:

. . . .

(d) the plan presently contemplates the corporate practice of medicine by requiring that where professional fees become a part of the MMPP, substantial portions of said MMPP income are to be paid to the Meharry Medical College for its unrestricted use in the College or its clinical and hospital facilities;

(e) the plan increases the cost of health care to patients by including in and adding to their patient fees said hidden contributions to Meharry Medical College and its agencies, including Hubbard Hospital and other clinical facilities who are already being paid for said health care to patients;

(f) the plan restrains competition of physicians who are members thereof by burdening of their fees with the aforesaid hidden costs which other physicians who are not members of the plan do not have;

(g) the plan restrains competition between MMPP physicians who are forced to join the plan by fixing their income at arbitrary levels which are not based on competition and without interactive influence between MMPP physician members so that their income is not based on medical services rendered or relative income generated;

(h) the plan restrains competition by requiring MMPP to contribute to the Medical College and its hospital facilities as a part of medical fee costs and thereby permits increased hospital fees to be charged by Hubbard Hospital without regard to cost or efficiency and without said hospital being required to compete with other hospitals;

(i) the requirement that full-time faculty members at Meharry Medical College, in-

cluding the plaintiff, lose their faculty positions as a condition of refusing to join such anticompetitive Medical Practice Plan with its aforesaid provisions working against cost-containment results in an illegal restraint of trade;

(Appendix 73–74). Plaintiff's affidavit, filed November 20, 1979, averred, in pertinent part:

Meharry Medical College is a nationally recognized institution, being one of two predominantly black medical schools in the country. As such, prior to the integration of predominantly white medical schools in the recent years, it graduated approximately one-half of the practicing black physicians in the United States. In the past, resident physicians of the Department of Surgery have rotated in practice through a hospital located in Mound Bayou, Mississippi, and resident physicians in pediatrics and other departments rotated through a hospital located in Tuskegee, Alabama. Students at Meharry are drawn from throughout the United States and several foreign countries. Doctors and other hospital personnel are recruited both nation and worldwide. Supplies to the hospital and the college are purchased through interstate commerce. Numerous patients at the hospital come from out of state and their bills are paid through out-of-state insurance companies and/or through federal programs administered in Washington, D.C., including, but not limited to, medicare and medicaid.

As a result of the operation of the Plan, I would be unable to receive all the income from my labor. Indeed, the Plan penalizes a practioner who commands a substantial income by taking a larger portion of his income than that of a practioner with less income for "administrative costs". This restrains competition by making it less profitable to perform patient services. Additionally, the Plan would operate to deprive me of income received for patient-care consultative services performed at places other than Hubbard Hospital by requiring that the income from same be turned over to the Plan and distributed according to its formula. . . .

The Plan operates to increase the costs of medical care to patients by adding to their fees hidden contributions to Meharry Medical College. Further, Hubbard Hospital and the various clinics of Meharry are already billing the patients for services performed in the hospital and/or clinics, the additional billing through the Plan, in which part of the income is given to Meharry, allows Meharry to be paid twice for the same service given to the patient.

(Appendix 669–70).

In sum, plaintiff explicitly or implicitly alleged a nexus between the Meharry Medical Practice Plan and the following channels of interstate commerce: (1) interstate recruitment and travel of Meharry students, (2) interstate recruitment and travel of Meharry physicians and other personnel, (3) collection of bills from out-of-state patients, (4) payment of patients' bills through out-of-state insurance companies and the federal government, (5) purchase by Meharry and/or Hubbard Hospital of supplies and equipment in interstate commerce, and (6) transmission in interstate commerce of federal subsidies for Meharry other than payments of patient fees.

Defendants denied plaintiff's Sherman Act jurisdictional allegation (Appendix 25, 56), introduced testimony that the percentage of Meharry patients from out-of-state was "by far under five percent" (Appendix 357), and submitted an affidavit by the Business Manager of the Meharry Medical Practice Plan which stated, *inter alia,* that during the relevant period the Plan involved over $1 million per year in medical fees (Appendix 28–30).

██ Viewing the foregoing pleadings and evidence in the light most favorable to the non-movant, *Hospital Building Co. v. Rex Hospital Trustees, supra,* 425 U.S. at 741, 742 n. 1, 96 S.Ct. at 1850, 1851 n. 1, we conclude that plaintiff alleged a nexus between the Meharry Medical Practice Plan and the interstate movement of Meharry

patients and medical fees sufficient to satisfy the interstate commerce element of Sherman Act jurisdiction. In so holding, we note: (1) plaintiff alleged that the Plan fixed medical fees at artificial levels,[3] (2) defendants did not attempt to rebut plaintiff's affidavit that substantial medical fees paid by out-of-state insurance companies and the federal government are transmitted in interstate commerce, and (3) defendants' assertion that less than five percent of Meharry patients are from out-of-state does not necessarily establish that their number and/or medical fees are insubstantial. Sherman Act jurisdiction does not fail because a plaintiff does not precisely quantify the alleged adverse impact a defendants conduct has on interstate commerce. *McLain, supra,* 444 U.S. at 243, 100 S.Ct. at 510; *Palmer v. Roosevelt Lake Log Owners Ass'n,* 651 F.2d 1289, 1293 (9th Cir.1981).

We express no opinion on the sufficiency of the alleged nexus between the Meharry Medical Practice Plan and other channels of interstate commerce, or on the merits of plaintiff's Sherman Act claims. Since the interstate commerce nexus established by plaintiff arises out of defendants' alleged illegal activity, i.e. the Medical Practice Plan, we also decline to decide whether *McLain* permits Sherman Act jurisdiction when interstate commerce is "substantially affected" by a defendant's general business but not by the alleged illegal conduct. *See* n. 2, *supra.*

For the foregoing reasons, we reverse dismissal of the Sherman Act claims and remand those claims to the district court for further proceedings consistent with this opinion.

## III

### A

Plaintiff alleged in his second Amended Complaint that defendants violated his rights under the First, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983.

Defendants moved for summary judgment on these claims on the grounds that the challenged conduct was not "state action" or "under color of state law".

The district court deemed the following principles applicable to these claims.

> Based upon [*Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); and *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ] in order to satisfy the significant state involvement prong of state action analysis, plaintiff must aver sufficient factual allegations to establish either a close nexus between the challenged activity and the state or the existence of a symbiotic relationship between defendants and the state.

> The Sixth Circuit has repeatedly held that "something more" than partial federal funding is needed for state action. *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1115 (6th Cir.1981); *Jackson v. Norton-Children's Hospitals, Inc.,* 487 F.2d 502, 503 (6th Cir.1973), *cert. denied,* 416 U.S. 1000, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974). In essence, the nexus requirement places the burden on the plaintiff to demonstrate that the state is involved not simply in some activity of the offending institution such as funding alone, but is involved with the activity that caused the injury to the plaintiff. *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815, 822 (S.D.Fla.1981).

(Appendix 702–03).

The court found that plaintiff's only reference to a state action nexus occurred in the following paragraphs of his Second Amended Complaint.

> ¶ 21. "On information and belief defendant Meharry Medical College and its agencies receive over 60% of their fi-

---

**3.** The district court found that the Plan had no effect on patient fees charged by Meharry physicians. We express no opinion on this finding, but note that failure to prove that an alleged price-fixing scheme actually affected prices does not preclude Sherman Act jurisdiction. *McLain, supra,* 444 U.S. at 243, 100 S.Ct. at 510.

nances from state and local Governments and, by virtue of public involvement in their financing, regulation and operation, a state agency." Plaintiff's "Second Amendment and Supplement to Complaint", filed March 27, 1979.

In addition, that complaint stated that the termination of plaintiff's employment as a faculty member and the termination of his staff privileges was:

... violative of due process of laws secured by the Fifth and Fourteenth Amendments in denying plaintiff notice and hearing prior to termination of his employment by an agency predominantly financed through public Federal and State funds ...

(Appendix 703). The court also noted that defendants submitted an affidavit by the President of Meharry Medical College which averred that Meharry operations were controlled solely by a private Board of Trustees, that the Medical Practice Plan was drafted by Meharry physicians and approved by the Meharry Trustees independent of any government regulation of the Plan's content, and that no governmental unit caused or influenced plaintiff's demotion and dismissal from Meharry. Finally, the court observed that the Meharry President's affidavit indicated that federal and state funds accounted for approximately 55% of Meharry's budget during the relevant period.

Based on the foregoing, the court concluded:

[P]laintiff asserts that there is "state action" because (1) Meharry receives a high percentage of federal and state funding, in fact it is denominated a federally dependent institution, and, (2) it is subject to extensive governmental regulation. Moreover, HEW threatened withdrawal of federal funds unless some sort of medical practice plan was adopted. Defendants state that while "a" plan was required, the challenged plan was drafted by the college physicians and that the state and federal governments have had no involvement with the administration or implementation of the adopted plan.

Finally, defendants state that the decision to terminate plaintiff's employment and staff privileges was neither required, influenced nor controlled by the state or federal government. It is important to precisely identify the alleged unconstitutional conduct. Plaintiff asserts that the conduct was the termination of his staff privileges and employment without notice and a hearing in violation of the due process clause. It could also possibly be inferred from the complaint that he believed he was terminated for exercising his First Amendment rights in speaking out against the Plan.

The HEW requirement generally that a medical practice plan be implemented had no connection with either the decision to terminate plaintiff or the manner in which that termination was accomplished. Moreover, even though the federal government mandated the adoption of a plan, the plan itself was formulated by plaintiff's colleagues. It was not an intricate regulatory scheme devised by the agency and imposed upon the college. Consequently, the policies and conduct here under attack have not been shown to have been influenced or supported by a governmental entity. The requisite nexus has not been demonstrated. The government involvement alleged is no more than simple funding contingent in part on the general requirement that a medical practice plan be implemented. Any nexus between that and the manner and reason for plaintiff's termination has not been sufficiently alleged. Accordingly, claims brought under 42 U.S.C. § 1983, the First, Fifth and Fourteenth Amendments to the Constitution must be dismissed for failure to demonstrate that the challenged conduct was "under color of state law" or "state action".

(Appendix 702–03, 705–06).

### B

We believe the grant of summary judgment in favor of defendants was premature for two reasons. First, the district court overlooked an averment by plaintiff which bears on the question of state action.

Plaintiff's affidavit filed November 20, 1979, states, in pertinent part:

> Hubbard Hospital has a contract with the Metropolitan Government of Nashville and Davidson County, Tennessee, for the treatment of indigent patients. To certify indigency, said Government employs at least two persons, whose office is located at the hospital.

(Appendix 669). Testimony by Meharry's President also refers to services for indigent patients. (Appendix 240).

■ It was incumbent upon the district court to evaluate this averment in conjunction with other allegations of "state action" regardless of whether it was overlooked by counsel, *Equal Empl. Opp. Comm'n v. Keco Industries, Inc.,* 617 F.2d 443, 446 (6th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 128 (1980), and to accord it every favorable presumption. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Fitzke v. Shappell,* 468 F.2d 1072, 1077 (6th Cir.1972). This rule assumes particular importance in this case because the critical inquiry as to state action is necessarily a case-by-case

factual determination. *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1113 (6th Cir.1981). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Ultimately, this may or may not be a "close case" on the state action question, see *Newsom v. Vanderbilt University, supra,* at 1116. At this juncture, we express no opinion on the merits; we hold only that plaintiff's affidavit created a "genuine issue as to [a] material fact," Fed.R.Civ.P. 56(c), which should be evaluated by the district court.

Second, defendants' refusal to provide responsive answers to plaintiff's interrogatories frustrated plaintiff's attempt to discover the extent of Meharry's contacts with, regulation by, and dependency upon federal, state, and local governments.[4] Defendants assert that plaintiff cannot now complain about their evasion because he did not seek a remedy from the district court. This argument lacks merit for the simple

---

**4.** Plaintiff served the following interrogatories on the defendants:

53. Identify each and every communication, written or oral, by source, date and substance of contents upon which Meharry Medical College or any of its agencies relies in regard to its claim that the United States Department of Health, Education, and Welfare, or any other governmental agency required Meharry Medical College or any of its agencies to impose a Medical Practice Plan upon its professional practitioners or to insist upon adoption of same.

56. List each and every requirement imposed on Meharry Medical College and each of its agencies, including but not limited to Hubbard Hospital, the Comprehensive Mental Health Center, the Comprehensive Health Center and the Matthew Walker Health Center imposed by the United States Government, the State of Tennessee and the Metropolitan Government of Nashville and Davidson County, Tennessee in connection with or as a condition of the furnishing of financial or other support to Meharry or its said agencies, attach a copy of any and all contracts, rules, regulations, correspondence or other documents reflecting said requirements.

In response to these interrogatories, defendants merely referred to their response to other interrogations, which read as follows:

8. Since the Court has determined that the Plan does not violate any anti-trust laws (See the Memorandum) and since the answers to this question do not reflect on the issues raised in the amended complaint, we respectfully decline to answer. See Rule 26 of the Federal Rules of Civil Procedure.

11. We respectfully decline to answer this interrogatory because to answer would be unduly burdensome and expensive and that would not be relevant or material to the subject matter involved in the pending action. See Rule 26 of the Federal Rules of Civil Procedure.

These answers were unresponsive for several reasons. At this point the district court had only decided the preliminary injunction motion, and had not determined the merits of plaintiff's Sherman Act claims. The present dispute over the existence of state action demonstrates the relevance and materiality of both interrogatories. Finally, if defendants considered these interrogatories unduly burdensome and expensive, they should have sought a protective order rather than evading the substance of facially reasonable questions. *See* Fed.R.Civ.P. 26(c).

reason that plaintiff filed a motion to continue discovery, in which he objected to defendants' evasion and requested the district court to extend the time for discovery. (Appendix 429–35). The record contains no indication that the district court considered or ruled on this motion before deciding defendants' motion for summary judgment.

 Although it is within the sound discretion of the district court to regulate discovery practice within the parameters set by the Federal Rules of Civil Procedure, 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2006, at 35 (1970), summary judgment should not ordinarily be granted before discovery has been completed. *Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co.,* 606 F.2d 602, 609 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980). This principle is particularly strong when constitutional and civil rights claims are at issue. *Porter v. Califano,* 592 F.2d 770, 778 (6th Cir.1979); *Mabey v. Reagan,* 537 F.2d 1036, 1050 (9th Cir. 1976); *see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2732.2 (1983). In this case, plaintiff was entitled to a ruling on his motion to extend discovery before the district court granted defendants' summary judgment motion.

We do not necessarily preclude the possibility that further discovery may be inappropriate because of undue delay, burden or expense, or for other reasons, but note that defendants have a heavy burden in resisting discovery given the facial reasonableness of the interrogatories in question. *See* n. 4, *supra.* It is for the district court to determine this question in the first instance. Accordingly, the grant of summary judgment for defendants on plaintiff's claims under the First, Fifth, and Fourteenth Amendments and § 1983 is reversed and remanded for further proceedings consistent with this opinion.

## IV

 Plaintiff also alleged that defendants violated the Thirteenth Amendment,

42 U.S.C. §§ 1981, 1982, 1985, 1986, 1988 and various provisions of Tennessee law. The district court granted summary judgment for defendants on these federal claims and dismissed the pendent state claims for lack of a cognizable federal claim. We have examined the record for error with respect to disposition of these federal claims. Finding none, we are of the opinion that the grant of summary judgment in favor of defendants should be affirmed. In light of our findings in Sections II and III with respect to plaintiff's other federal claims, we reverse dismissal of the state claims and remand for further consideration by the district court on the question of pendent jurisdiction. We express no opinion on the merits of these state claims or the propriety of assuming pendent jurisdiction given the ultimate disposition of the remaining federal claims.

In conclusion, we reverse the judgment of the district court dismissing plaintiff's Sherman Act claims for lack of jurisdiction. We reverse the summary judgment in favor of defendants on plaintiff's claims under the First, Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983. We affirm the summary judgment in favor of defendants, holding that they did not violate the Thirteenth Amendment to the Constitution of the United States, and did not violate 42 U.S.C. §§ 1981, 1982, 1985, 1986, 1988. Finally, we reverse dismissal of plaintiff's pendent state claims for lack of a cognizable federal claim.

We remand to the district court for further consideration and determination consistent with this opinion. We express no opinion on the merits of this case.