**Chris R. PLOTT, Plaintiff–Appellant,**

v.

**GENERAL MOTORS CORPORATION, PACKARD ELECTRIC DIVISION, Defendant–Appellee.**

No. 94–3952.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1995.

Decided Dec. 20, 1995.

Michael D. Rossi (argued and briefed), Guarnieri & Secrest, Warren, OH, for Chris R. Plott.

Robert S. Walker, Joseph D. Pollack (argued and briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, for General Motors Corp., Packard Elec. Div.

Before: KENNEDY and MOORE, Circuit Judges; JOHNSTONE, Senior District Judge.*

MOORE, Circuit Judge.

Plaintiff appeals a summary judgment dismissing his Title VII reverse discrimination suit against defendant General Motors Corporation ("GM"). We affirm for the reasons that follow.

## I.

### A.

In 1983, after a national investigation of GM's employment practices by the Equal Employment Opportunity Commission (the "EEOC"), GM and the EEOC entered into a Conciliation Agreement (the "Agreement") covering GM facilities nationwide. Although GM denied all allegations of discrimination, the Agreement set various remedial employment goals. The provision relevant to this case required GM to "make good faith efforts to assure that ... minorities are at least 15.5% of those chosen for apprenticeship openings, and women are at least 12.0%." In addition, the Agreement directed GM to "provide pre-apprentice training for minorities and women at selected facilities where openings are anticipated in the foreseeable future."

In 1987, Chris R. Plott, an unskilled white male employee at GM's Packard Electric Division, successfully tested for admission into a skilled trades apprentice program at GM. However, Plott was not admitted into the program because the group of successful applicants for the forty available apprenticeships did not contain the percentage of women and minorities required under the Agreement. To remedy this problem and purge the selection process of any discriminatory impact, GM revised the test and offered the

* The Honorable Edward H. Johnstone, Senior United States District Judge for the Western District of Kentucky, sitting by designation.

revised version to applicants. Plott again had one of the top forty scores, but the group once more failed to include the requisite percentage of women and minorities.

GM therefore decided to institute a pilot two-week pre-apprentice training program designed to develop the skills necessary to qualify for an apprenticeship. Any woman or minority who had come within twelve points of the score needed to qualify on the revised test was invited to participate in the program. At the end of the training, the trainee took a pre-apprentice training exam, a high score on which entitled the trainee to a seven-point increase in his or her score on the revised apprenticeship test. In addition, each trainee was allowed to retake the revised test; GM anticipated that a second try would result in a five-point increase over the trainee's previous score.

After the women and minorities had completed the training program and retaken the revised test, their new scores were integrated into the list of scores that Plott and other white male applicants had previously achieved. The result was that the number of minorities in the top forty exactly equaled the percentage needed under the Agreement, and the number of women exceeded the requisite percentage. GM then admitted everyone in the new top forty. Plott was displaced by some of the new scores and no longer qualified for an apprenticeship.

### B.

After meeting the procedural requirements for a Title VII claim and receiving a right-to-sue letter from the EEOC, Plott filed suit in federal district court. The district judge awarded GM judgment on the pleadings, but this court reversed, finding that Plott should have been allowed to file an amended complaint. *See Plott v. General Motors Corp., Packard Elec. Div.,* No. 92–3166, 1993 WL 59316 (6th Cir. March 5, 1993) (unpublished disposition). On remand, Plott's second amended complaint alleged two violations of section 703 of Title VII, 42 U.S.C. § 2000e–2. First, Plott claimed that because a particular provision of the Conciliation Agreement was facially discriminatory, the adoption of the Agreement was itself an illegal act. Second,

he alleged that GM violated Title VII by exceeding the Agreement's terms in its implementation of the pre-apprentice training program. He sought monetary relief of $100,000 and attorney fees.

The district court granted GM's motion for summary judgment. Plott appeals the summary judgment and also appeals the district judge's refusal to allow additional discovery.

### II.

██ We review grants of summary judgment de novo, viewing all facts and inferences drawn therefrom in the light most favorable to the appellant. *City Management Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 250 (6th Cir.1994). Reversal is warranted if the appellant can demonstrate the existence of a genuine issue of material fact. *Id.*

### A.

██ Plott first claims that the actual adoption of the Agreement violated Title VII. In order to show that the adoption of an EEOC conciliation agreement was an independent act of discrimination, a party must demonstrate that the agreement constitutes a bad faith attempt to bestow unequal employment benefits. *See EEOC v. McCall Printing Corp.,* 633 F.2d 1232, 1238 (6th Cir.1980); *see also Marcantel v. State of La., Dep't of Transp. and Dev.,* 37 F.3d 197, 200–202 (5th Cir.1994) (following *McCall* ); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 624–25 (10th Cir.1987) (same). In support of his claim, Plott points to the provision that instructs GM to "make good faith efforts to assure that … minorities are at least 15.5% of those chosen for apprenticeship openings and women are at least 12.0%." He argues that this provision represents a bad faith attempt to bestow unequal benefits because the inclusion of the phrase "at least" technically allows the plan to produce an apprentice class composed entirely of women and minorities.

No evidence in this case shows that GM joined in adopting this provision in order to provide unequal employment benefits to women and minorities. Moreover, the "at least" language, standing alone, does not evi-

dence such an intent. In fact, the first Supreme Court case on affirmative action under Title VII approved a plan that contained similar language. *See United Steelworkers of Am. v. Weber,* 443 U.S. 193, 224 n. 3, 99 S.Ct. 2721, 2738 n. 3, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting) (noting that plan provided that *"at a minimum, not less than* one minority employee will [qualify] for every non-minority" (emphasis added)). Aside from his reading of this clause, Plott has offered no basis for his allegation that the Agreement was adopted in bad faith to provide unequal benefits. Summary judgment on this point was therefore correct.

### B.

■ Plott next contends that GM's affirmative action program was unlawfully discriminatory because it exceeded the Conciliation Agreement's goals. To support this argument, he points to the fact that GM admitted an apprentice class that was 27.5% female even though the Agreement only required 12%. Had GM not overshot the Agreement's goals with respect to females, Plott argues, he would have secured an apprenticeship. Plott admits that GM did not exceed the Agreement's goals with respect to minorities, and therefore does not allege race discrimination in the implementation of the Agreement.

The proper inquiry is whether GM's pre-apprentice training program constituted a good faith attempt to comply with the Agreement's affirmative action provisions, not whether there were more women actually admitted to the apprentice program than the minimum number required under the Agreement. Pursuant to section 713(b) of Title VII, 42 U.S.C. § 2000e–12(b),

[i]n any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the [EEOC].... Such a

defense, if established, shall be a bar to the action....

This section insulates employers from liability for decisions made in reliance on an EEOC opinion.

■ In the year following the adoption of the Conciliation Agreement, the EEOC sent GM a letter stating that

[i]t is the opinion of the Commission that any action or omission of General Motors Corporation ..., or any of [its] officers, agents or employees, that is or shall be taken in a good faith attempt to comply with the affirmative action or other provisions of the Conciliation Agreement ... will not constitute a violation of any of the provisions of Title VII.

The letter met all the requirements of 29 C.F.R. § 1601.93 (1995) and therefore qualified as an EEOC opinion under section 713(b). Consequently, as long as GM acted in good faith in attempting to comply with the Agreement, it did not violate Title VII. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 423 n. 17, 95 S.Ct. 2362, 2374 n. 17, 45 L.Ed.2d 280 (1975) (noting that good faith reliance on EEOC opinion conveys complete immunity in Title VII actions).

In this case there is no evidence to suggest that GM acted in bad faith. In fact, Plott admitted in his deposition that he believed that the program was a good faith attempt to meet the Agreement's goals. Indeed, it is difficult to see what stage of GM's decision-making process could be attacked as lacking in good faith. When GM first administered its apprenticeship test, the top forty candidates did not include enough women and minorities to satisfy the Agreement's goals; only three women and no minorities were included in the top forty. GM therefore revised the test to purge it of any discriminatory impact. The revised test, however, again produced a class with insufficient percentages. GM then followed the Agreement's explicit instruction to institute pre-apprentice training, and solicited only those female and minority candidates whose scores had been close enough to the top forty that the training program could reasonably be expected to develop the skills necessary for

them to secure and succeed in an apprenticeship.

The pre-apprentice training program was a success. After the program, eleven women qualified as apprentices. In retrospect, it could be argued that GM might have invited fewer women to participate in the training, in order to meet the exact minimum number in the Conciliation Agreement of five females. However, this was the first time the program was offered, and GM had no way of knowing how successful it would be or how many participants would ultimately qualify. Alternatively, as Plott suggests, GM could have admitted the minimum number of women necessary to satisfy the Agreement's goals, by selecting only the top five women. However, the Agreement clearly allowed GM to exceed the percentage target; it required "at least 12.0%" women and stated that "[t]he goals contained in this Agreement are not intended to operate as a quota or ceiling upon the employment of minorities or women." It also noted that "[a]ttainment of these goals is predicated on the assumption that some facilities will meet the goals, some facilities will exceed the goals, and some facilities will not meet the goals." Trimming the number of females to five from the group of eleven who qualified after participating in pre-apprentice training not only was not required by the Agreement but also would detract from achieving the purpose of the pre-apprentice training program and the Agreement itself.

In short, anything *less* than 12% would have violated the Agreement's terms, but GM could admit *more* than 12% women and still be in compliance. GM decided to award apprenticeships to each of the eleven women whose participation in the training program—a program specifically designed to foster the skills an apprentice would need—had earned her a place among the top forty candidates. Such a decision did not result in a significant deviation from the Agreement's goals and is well within the terms of the Agreement.

Here, as the district court noted, the Agreement was reached to remedy underrepresentation of women and minorities. It does not take away seniority rights of white male employees, does not require replacement of white male employees, and does not prevent white male employees from participating in the apprenticeship program. *See Johnson v. Transportation Agency,* 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987); *United Steelworkers of Am. v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729–30, 61 L.Ed.2d 480 (1979). Under these circumstances, then, there is no genuine issue of fact material to a claim of bad faith. In fact, GM's conduct appears to be a reasonable attempt to comply with the terms of a federally approved affirmative action plan. The district court properly granted defendant summary judgment.

## III.

■ The final issue is whether the district court's refusal to allow Plott additional discovery is reversible error. Plott filed a motion for additional discovery and also submitted an affidavit under Federal Rule of Civil Procedure 56(f), requesting more time to learn the details of a local GM affirmative action plan and to obtain a list of the names of those who secured apprenticeships.

## A.

■ Before ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 257, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986) (stressing importance of allowing ample time for discovery); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 326, 106 S.Ct. 2548, 2552, 2554, 91 L.Ed.2d 265 (1986) (same). Parties who suffer an adverse summary judgment may base their appeals on the lack of opportunity to discover evidence necessary to establish a genuine issue of material fact. Generally, however, we decline to review a claim that is presented for the first time on appeal. *See Taft Broadcasting Co. v. United States,* 929 F.2d 240, 243–44 (6th Cir.1991); *see also Roush v. KFC Nat'l Management Co.,* 10 F.3d 392, 397 (6th Cir.1993) (considering whether district court had opportunity to rule on issue being appealed), *cert. denied,* —— U.S. ——, 115 S.Ct.

56, 130 L.Ed.2d 15 (1994); *Young v. Langley,* 793 F.2d 792, 794 (6th Cir.) (same), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986). In the discovery context, before seeking appellate review the parties normally should have given the district court a chance to address their need for further discovery prior to summary judgment.

In practice, this means that appeals alleging inadequate opportunity for discovery come in two distinct forms after adverse summary judgment. The first consists of a challenge to a particular adverse discovery ruling, such as a denial of a motion to extend the discovery period. *See, e.g., Wayne v. Village of Sebring,* 36 F.3d 517, 530 (6th Cir.1994) (denial of motion to conduct additional discovery after cut-off date), *cert. denied,* —— U.S. ——, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995); *Woods v. McGuire,* 954 F.2d 388, 391 (6th Cir.1992) (denial of request for additional discovery time); *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 892–94 (6th Cir.1991) (denial of request to depose witnesses); *Criss v. City of Kent,* 867 F.2d 259, 261 (6th Cir.1988) (denial of request to depose witnesses); *see also Tarleton v. Meharry Medical College,* 717 F.2d 1523, 1534–35 (6th Cir. 1983) (reversing summary judgment because district court failed to rule on motion to extend time for discovery).

■ The second type of appeal is a more general claim that the district court acted prematurely by granting summary judgment before discovery was complete. In these cases, the district court did not refuse to allow requested discovery; the only adverse ruling on which the appellant can base its appeal is the summary judgment itself. Under these circumstances, in order to preserve the argument that the grant of summary judgment was too hasty and precluded necessary discovery, the appellant must have complied with the strictures of Federal Rule of Civil Procedure 56(f), under which the district court may defer summary judgment, pending discovery, if the non-movant submits affidavits stating that "the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition."

*See, e.g., White's Landing Fisheries, Inc. v. Buchholzer,* 29 F.3d 229, 231–32 (6th Cir. 1994) (reversing summary judgment in light of appellant's Rule 56(f) affidavit); *Glen Eden Hosp., Inc. v. Blue Cross and Blue Shield of Mich., Inc.,* 740 F.2d 423, 428(6th Cir.1984) (holding that summary judgment was premature given opposing party's Rule 56(f) affidavit). In other words, if the appellant has not filed either a Rule 56(f) affidavit or a motion that gives the district court a chance to rule on the need for additional discovery, this court will not normally address whether there was adequate time for discovery. *See Klepper v. First Am. Bank,* 916 F.2d 337, 343 (6th Cir.1990) (affirming grant of summary judgment despite insufficient discovery opportunity where appellant never filed Rule 56(f) affidavit); *Emmons v. McLaughlin,* 874 F.2d 351, 356–57 (6th Cir. 1989) (affirming summary judgment due to lack of adequate Rule 56(f) affidavit); *Shavrnoch v. Clark Oil and Refining Corp.,* 726 F.2d 291, 294 (6th Cir.1984) (holding that, absent Rule 56(f) affidavit, the district court was entitled to rule on a summary judgment motion at any time).

■ Regardless of which form the appeal takes, this court has generally applied the abuse of discretion standard, although the case law reveals several different permutations of this standard. *Compare, e.g., Bush v. Rauch,* 38 F.3d 842, 849 (6th Cir.1994) ("abuse of discretion"); *Woods,* 954 F.2d at 391 (same); *Emmons,* 874 F.2d at 359 (same); *Glen Eden,* 740 F.2d at 428 (same), *with Criss,* 867 F.2d at 261 ("clearly an abuse of discretion"), *with Wayne,* 36 F.3d at 530 (" 'abuse of discretion resulting in substantial prejudice' " (quoting *Elvis,* 936 F.2d at 893)). A number of different factors are applicable to such claims, such as (1) when the appellant learned of the issue that is the subject of the desired discovery, *see Woods,* 954 F.2d at 391; (2) whether the desired discovery would have changed the ruling below, *see Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133, 138 (6th Cir.1993); *Elvis,* 936 F.2d at 894; *Rhodes v. McDannel,* 945 F.2d 117, 119 (6th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992); *Shavrnoch,* 726 F.2d at 294; (3) how long the discovery period had

lasted, *see Woods,* 954 F.2d at 391; *Emmons,* 874 F.2d at 359 n. 8; (4) whether the appellant was dilatory in its discovery efforts, *see Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993); *McTighe v. Mechanics Educ. Soc'y of Am., Local 19,* 772 F.2d 210, 213 (6th Cir.1985); and (5) whether the appellee was responsive to discovery requests, *see Tarleton,* 717 F.2d at 1534–35; *Glen Eden,* 740 F.2d at 428.

### B.

Applying these various factors to this case, we conclude that the district court did not abuse its discretion in denying Plott's motion for additional discovery and refusing to defer summary judgment under Rule 56(f). First, Plott was dilatory in his efforts to secure the information on which he bases his claim. He first learned of a local affirmative action plan at least three weeks before the end of the discovery period, but did not request any information during the remaining time. His need to know the names of those who had secured apprenticeships became apparent even earlier in the discovery process. Second, even if Plott had received the materials he wanted, this case's outcome would be the same. Section 713(b) of Title VII grants GM immunity for the employment decisions at the core of this litigation, and the additional information Plott sought was irrelevant to section 713(b)'s application.

In fact, the only evidence in the record that supports Plott's claim is that GM was not cooperative during discovery. Under different circumstances, such uncooperative behavior might merit reversal. In this case, however, even the most forthcoming responses would not have changed the ultimate result. Therefore, in the context of review for abuse of discretion, the district court's discovery rulings do not constitute reversible error.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.